EDWARD GENESKY *v.* TOWN OF EAST LYME
(SC 17152)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued October 18, 2004—officially released August 30, 2005

*Nathan Julian Shafner*, for the appellant (plaintiff).

*Michael P. Carey*, with whom, on the brief, was *Susan M. Phillips*, for the appellee (defendant).

*Opinion*

ZARELLA, J. The dispositive issue in this appeal is whether the plaintiff, Edward Genesky, is a regular member of a paid municipal police department for purposes of receiving benefits under the Heart and Hyper-

tension Act, General Statutes § 7-433c.[1] The plaintiff, a constable employed by the defendant, the town of East Lyme (town), appeals from the decision of the compensation review board (board), which affirmed the decision of the workers' compensation commissioner for the eighth district[2] (commissioner) dismissing his claim for benefits under § 7-433c on the ground that he was not a regular member of a paid municipal police department. The plaintiff claims that the board improperly affirmed the commissioner's decision because: (1) the town has a paid municipal police department of which he is a part; (2) the state's interest in providing heart and hypertension benefits to municipal law enforcement officers preempts the town's interest in denying such benefits; and (3) the town concedes that members of its police force are entitled to benefits under § 7-433c.

[1] General Statutes § 7-433c provides in relevant part: "(a) Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event . . . a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. . . .

"(b) Notwithstanding the provisions of subsection (a) of this section, those persons who began employment on or after July 1, 1996, shall not be eligible for any benefits pursuant to this section."

[2] In its opinion dated December 8, 2003, the board noted that, although the workers' compensation commissioner's findings and dismissal indicated that he was acting on behalf of the fourth district, he was acting, in fact, on behalf of the eighth district.

We reject the plaintiff's claim and, accordingly, affirm the decision of the board.

The following relevant facts, as found by the commissioner, are set forth in his decision of December 5, 2002. In 1989, the town hired the plaintiff as a full-time police officer. Thereafter, the plaintiff claimed that he had injured his knee in the course of his employment on January 21, 1992. On that date, Joseph Zeppieri, an orthopedic surgeon, treated the plaintiff for his injury, but counseled against going forward with surgery because of the plaintiff's elevated blood pressure.

Zeppieri referred the plaintiff to another physician, George Burton, who met with the plaintiff on January 28, 1992, and diagnosed him with hypertension.[3] The plaintiff's blood pressure readings continued to be elevated between January 28, 1992, and November 20, 1997. Burton prescribed medication to treat the condition. The plaintiff also received treatment for hypertension from two other physicians, but failed to file a timely claim for hypertension benefits with the commissioner or his employer.[4]

In September, 1999, the plaintiff experienced what he initially believed were back spasms. Ultimately, it was determined that the spasms were caused by a myocardial infarction. The plaintiff filed a claim under § 7-433c for heart and hypertension benefits related to the myocardial infarction, with a claimed injury date of October 8, 1999. The commissioner determined, however, that the plaintiff's hypertension was a factor in the development of his coronary artery disease. He therefore found that, because the plaintiff had been

---

[3] According to Burton's records, the plaintiff was diagnosed with hypertension on January 21, 1992, when he was examined by Zeppieri.

[4] The commissioner specifically found that, although Zeppieri and Burton advised the plaintiff that he had hypertension, the plaintiff "failed to follow through accordingly with filing a timely [form] 30C in [regard] to the claim."

receiving continuous treatment for his hypertension and heart condition since January 21, 1992, the October 8, 1999 injury was part of one continuous incident beginning in January, 1992.

The commissioner also found that the plaintiff was working as a constable for the town on the date of his alleged injuries in 1992 and 1999, and that the town did not have a municipal police department. As a result, the commissioner dismissed the plaintiff's claim because it was untimely and because the plaintiff was not a regular member of a paid municipal police department organized pursuant to General Statutes § 7-274[5] and *Zimmer* v. *Essex*, 38 Conn. Sup. 419, 421, 449 A.2d 1053 (1982).[6] The plaintiff thereafter appealed to the board.

[5] General Statutes § 7-274 provides in relevant part: "Any town may, by ordinance, establish a board of police commissioners . . . for the purpose of organizing and maintaining a police department in such town. . . ."

[6] The town also cites *Zimmer* for the proposition that benefits under § 7-433c are limited to members of police departments and are not available to members of constabularies. Although this court does not rely on *Zimmer* as precedent, we note that the court in *Zimmer* interpreted §§ 7-433c and 7-274 under facts similar to those of the present case. See *Zimmer* v. *Essex*, supra, 38 Conn. Sup. 419-20. The plaintiff, Charles Zimmer, who worked for the town of Essex as a constable, brought an action seeking benefits under § 7-433c after being diagnosed with ischemic heart disease. Id. The town of Essex did not have an organized police department pursuant to § 7-274, but employed a resident state trooper to supervise the plaintiff. Id., 420. The plaintiff's duties included the routine duties of a police officer, including street patrol, traffic regulation, investigation of accidents and making arrests. Id. The commissioner dismissed the plaintiff's claim, however, after finding that "he was not a regular member of a paid municipal police department" within the meaning of § 7-433c. Id. On appeal, the board adopted the commissioner's finding and affirmed the dismissal of the plaintiff's claim. Id.

The plaintiff appealed to the Superior Court, which affirmed the board's decision. Id., 421. The court reasoned that the terms of the statute were unambiguous and that, because the town of Essex did not have an organized police department under § 7-274, the plaintiff had failed to prove that he was "a regular member of a paid municipal police department." (Internal quotation marks omitted.) Id. As a result, the plaintiff was not entitled to benefits under § 7-433c. Id.

In *Zimmer*, the court did not discuss the specific attributes of a "municipal police department." The court merely agreed with the conclusion of the

In reviewing the plaintiff's claim, the board first addressed the threshold issue of whether the plaintiff fell within the class of employees to which § 7-433c benefits apply, namely, "a regular member of a paid municipal police department . . . ." General Statutes § 7-433c (a). Following its examination of the commissioner's findings, the board noted that the town had established a constabulary and that it had contracted with the state department of public safety to participate in the resident state trooper program.[7] The board thus concluded that the plaintiff was a constable. The board further noted that the facts of the present case were analogous to the facts of *Zimmer* v. *Essex*, supra, 38 Conn. Sup. 419–20, in which the Superior Court determined that a municipal police force not organized in conformity with the provisions of § 7-274 is a police force to which § 7-433c does not apply. See id., 421. The board then observed that, according to testimony presented at formal hearings on the matter, law enforcement operations in the town differed from those of a municipal police force organized under § 7-274 because the town did not have a lockup, the town's first selectman served as the chief of police, an East Lyme police officer's powers of arrest were limited and the plaintiff's duties as a constable differed from those of "a regular member of a paid municipal police force." (Internal quotation marks omitted.) The board added that § 7-433c has been characterized as "bonus" legislation and must be strictly construed. (Internal quotation marks omitted.) The board concluded that the plaintiff was

board that § 7-274 is "the only legislatively sanctioned method by which a Connecticut municipality may provide itself police protection through the organization of a police department." (Internal quotation marks omitted.) Id.

[7] The contract provided that the town would "delegate the authority to the State Police to supervise and direct the operations of the appointed constables and police in the Town, including their working schedules, subject to collective bargaining agreements while at the same time the Town [would] retain responsibility, administrative and otherwise, for such personnel."

not a member of the class of persons to which § 7-433c applies and affirmed the commissioner's decision on that ground alone, finding it unnecessary to reach the issue of whether the plaintiff's claim was time barred.[8] This appeal followed.

We begin by setting forth the standard of review applicable to workers' compensation appeals.[9] "It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board. . . . A state agency is not entitled, however, to special deference when its determination of a question of law has not previously been subject to judicial scrutiny. . . . Whe[n] . . . [a workers' compensation] appeal involves an issue of statutory construction that has not yet been subjected to judicial scrutiny, this court has plenary power to review the administrative decision." (Internal quotation marks omitted.) *Bergeson* v. *New London*, 269 Conn. 763, 769, 850 A.2d 184 (2004). The present appeal raises an issue of statutory construction that is of first impression for this court. Our review of the board's administrative decision is therefore plenary.

The plaintiff claims that, although he was employed as a full-time constable by the town at the time of his injury, he is entitled to heart and hypertension benefits under § 7-433c because he was "a regular member of a paid municipal police department . . . ." General Statutes § 7-433c. The town responds that the plaintiff

---

[8] Because we conclude that the plaintiff is not entitled to benefits under § 7-433c, we need not reach his claim that the board improperly declined to address the issue of whether the commissioner correctly had concluded that the plaintiff's claim for benefits was untimely.

[9] Although an award of benefits under § 7-433c is not a workers' compensation award, the Workers' Compensation Act is used as a "procedural avenue" for the administration of benefits under § 7-433c. (Internal quotation marks omitted.) *Carriero* v. *Naugatuck*, 243 Conn. 747, 755, 707 A.2d 706 (1998).

does not qualify for § 7-433c benefits because there is a difference between a paid municipal police department and a constabulary, and the town has chosen to ensure public safety by establishing a constabulary. We agree with the town.

The plaintiff's claim that his status as a constable does not preclude him from being considered a regular member of a paid municipal police department under § 7-433c requires us to examine, first, whether the statutory provisions distinguish between a constable and "a regular member of a paid municipal police department," and, second, whether the town has a "paid municipal police department" under the statutory scheme. General Statutes § 7-433c. We consider each of these questions in turn.

I

The gravamen of the plaintiff's complaint is that, despite his status as a constable, he is a regular member of a paid municipal police department. We first consider whether there is a difference between a constable and a regular member of a paid municipal police department within the meaning of the relevant statutory provisions. We conclude that there is.

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . ." (Internal quotation marks omitted.) *Wasko* v. *Manella*, 269 Conn. 527, 534–35, 849 A.2d 777 (2004). When construing a statute, we first look to its text, as directed by General Statutes § 1-2z, which provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and

unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."[10] In the present case, we conclude, following an examination of the language of the statute and its relationship to other statutes, that a constable is not "a regular member of a paid municipal police department," as that term is used in General Statutes § 7-433c.

General Statutes § 7-433c (a) provides in relevant part that heart and hypertension benefits shall be available to "a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, [and who] suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability . . . ."

Section 7-433c contains no functional definition of the term "paid municipal police department." Moreover, there is no provision in the statutory scheme that contains such a definition. We therefore turn for guidance, as directed by § 1-2z, to related statutes that distinguish between police departments and constabularies to determine whether a constable is "a regular member of a paid municipal police department . . . ." General Statutes § 7-433c.

It is clear from a review of the relevant statutory provisions that local law enforcement arrangements

---

[10] The legislature enacted § 1-2z in response to our decision in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003), and we have recognized that this statute "has legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of sources of the meaning of legislative language in addition to its text." *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, 266 Conn. 706, 716 n.10, 835 A.2d 33 (2003) (construing Public Acts 2003, No. 03-154, § 1, which is now codified at § 1-2z).

can take many forms and that a police department is not a constabulary. General Statutes § 7-294a employs the generic term " 'law enforcement unit' " to describe "any agency, organ or department of this state or a subdivision or municipality thereof, whose primary functions include the enforcement of criminal or traffic laws, the preservation of public order, the protection of life and property, or the prevention, detection or investigation of crime . . . ." The statute then distinguishes between constables and members of a police department by defining the generic term " 'police officer' " as "a sworn member of an organized local police department, an appointed constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, 29-18a or 29-19 or any member of a law enforcement unit who performs police duties . . . ."[11] General Statutes § 7-294a.

General Statutes § 7-277a further differentiates between municipal police departments and constabularies in the context of police assistance agreements. Subsections (a) and (b) of that statute describe the rules governing cooperation between the "police forces" of the requesting and responding municipalities. The statute specifically provides that, after the chief executive officer of a town receives a request for assistance from his counterpart in another town, "the chief executive officer, or chief of police or board of police commissioners or other duly constituted authority" may make available for duty "such part of the police forces under his control as he deems consistent with the safety and well-being of his municipality. . . ." General Statutes § 7-

[11] Although the term " 'police officer,' " as used in § 7-294a, applies to all of those persons described in the statute who perform police duties, the statute should not be interpreted to mean that a constable is a member of an organized local police department. The statute clearly differentiates between a sworn member of an organized local police department and a constable, both of whom are members of the larger class of persons known as "police officers." General Statutes § 7-294a.

277a (a). Subsection (c) of the statute separately provides: "The chief executive officer of any town . . . which provides police protection solely by a constabulary force may enter into an agreement with one or more municipalities to furnish or receive police assistance . . . ." General Statutes § 7-277a (c). The statute thus draws a sharp and explicit distinction between a "police force" and a "constabulary force" by granting primary authority, in towns with a police department, to the chief of police[12] or the board of police commissioners to make police officers available for the purpose of assisting another municipality,[13] while granting similar authority, in towns with a constabulary, to the chief executive officer of the municipality.

Numerous other statutes similarly distinguish between police officers who are members of a local police department and constables. General Statutes § 1-24 (13) (oaths may be administered by "any sworn member of any local police department . . . in all affidavits, statements, depositions, complaints or reports made to or by any member of any local police department . . . or any constable who is under the supervision of [the] commissioner [of public safety]"); General Statutes § 5-259 (a) (comptroller "shall arrange and procure a group hospitalization and medical and surgical insurance plan or plans for . . . [6] the surviving spouse, and any dependent children until they reach the age of eighteen, of . . . a member of an organized local police department . . . or a constable who performs criminal law

---

[12] Section 7-277a (a) makes clear that the chief of police and the chief executive officer of such a municipality are two different persons because the latter must approve the police chief's decision, unlike in the town of East Lyme, where the duties of both the chief executive officer and the chief of police reside in the first selectman.

[13] General Statutes § 7-277a (a) provides that the chief executive officer of the municipality must approve the decision of the chief of police or the board of police commissioners to make members of its police force available to another municipality.

enforcement duties who dies . . . as the result of injuries received while acting within the scope of such officer's . . . or constable's employment and not as the result of illness or natural causes"); General Statutes § 9-230 ("[t]he registrars of voters may request the head of the police department of the municipality, or, if none, a constable serving such municipality, to provide police protection at any polling place of any regular or special state or municipal election where they may anticipate disorder"); General Statutes § 14-152 ("each municipal police department and each constable of any town" shall report theft or recovery of stolen motor vehicle to commissioner of motor vehicles and National Automobile Theft Bureau); General Statutes § 15-76 (a) ("[t]he commissioner [of transportation], any employee of the department [of transportation], any officer attached to an organized police department, any state police officer or any constable, within his or her precinct" may take abandoned aircraft into custody for storage in suitable place); General Statutes § 29-7m (b) ("[t]he police department, resident state trooper or constable who performs law enforcement duties for each town shall monitor, record and classify all crimes committed within such town" motivated by bigotry or bias); General Statutes § 53a-3 (9) ("[p]eace officer means a member of the Division of State Police within the Department of Public Safety or an organized local police department . . . [or] a constable who performs criminal law enforcement duties" [internal quotation marks omitted]); General Statutes § 53a-54b (1) (person is guilty of capital felony if convicted of "[m]urder of a member of the Division of State Police within the Department of Public Safety or of any local police department . . . [or] a constable who performs criminal law enforcement duties"); General Statutes § 54-1f (a) ("[p]eace officers, as defined in subdivision [9] of section 53a-3, in their respective precincts, shall arrest,

without previous complaint and warrant, any person for any offense in their jurisdiction"); General Statutes § 54-1f (c) ("[m]embers of any local police department or the Office of State Capitol Police and constables . . . when in immediate pursuit of one who may be arrested under the provisions of this section, are authorized to pursue the offender outside of their respective precincts into any part of the state in order to effect the arrest").

The only logical conclusion to draw from the legislature's repeated distinction in numerous statutory contexts between police officers who are constables and those who are members of a local police department is that the two positions are not synonymous. The fact that there is no language in § 7-433c that specifically refers to constables is, therefore, significant in light of the legislature's express reference in other statutory provisions to constables *and* members of a local police department.

Moreover, if the legislature wants to grant benefits to both constables and members of a local police department in a single statutory provision, it knows how to do so. For instance, § 5-259 (a) (6) requires the state comptroller to procure health insurance for a surviving spouse and certain dependent children of a member of an organized local police department *or* a constable who performs criminal law enforcement duties. Had the legislature intended that constables receive benefits under § 7-433c, it presumably would have expressed its intention directly, as it did in § 5-259 (a) (6). E.g., *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 699, 755 A.2d 850 (2000) (if legislature had intended to confer tax benefit on certain class of taxpayers, it easily could have expressed that intent). Accordingly, we conclude that related statutory provisions clearly distinguish between members of a local police department and constables, and that constables

were not intended to come within the class of persons eligible for benefits under § 7-433c.

## II

We next consider whether the plaintiff is a constable or a regular member of a paid municipal police department under the law enforcement arrangements adopted by the town. The plaintiff claims that he qualifies for benefits under § 7-433c because the town has a paid municipal police department of which he is a member. We disagree on the ground that statutes pertaining to the organization and function of police departments and constabularies, when applied to the facts of this case as found by the commissioner, firmly establish that the town has a constabulary.[14]

Part I of chapter 104 of the General Statutes, entitled "Police Departments," begins by providing that any town may establish by ordinance an elected or appointed board of police commissioners "for the purpose of organizing and maintaining a police department in such town." General Statutes § 7-274. The commis-

---

[14] The concurring opinion declares that the majority employs extratextual *sources of meaning in this portion of its analysis. These sources allegedly* include the town charter and ordinances, and the collective bargaining agreement between the police union and the town. We emphatically disagree. The majority first examines the statutory provisions pertaining to police departments and constabularies, including General Statutes §§ 7-88, 7-92, 7-274, 7-276, 7-277 and 29-5, for the purpose of distinguishing between them, and then reviews the town charter and ordinances to determine whether they are consistent with either of these organizational arrangements. The majority thus applies the law, as defined in the relevant statutory provisions, to the facts of the case. The majority does not use the charter and ordinances to determine what a police department *is*. Rather, the majority uses them to determine whether the town's law enforcement agency is a constabulary or a police department under the relevant statutes. The concurring opinion's suggestion that we interpret a statute by seeking guidance from the facts of the case turns the process of statutory interpretation on its head. If the facts of a case were used to determine the meaning of any given statutory provision, there would be an infinite number of possible interpretations of the statute, which would depend on the circumstances of the case.

sioners' powers shall include the "general management and supervision of the police department . . . and of the property and equipment used in connection therewith . . . [and the] appointment, promotion and removal of the officers and members of such police department . . . ." General Statutes § 7-276.[15] Furthermore, "[t]he expenses, salaries and all costs of maintenance and equipment for such police department shall be paid by such town . . . ." General Statutes § 7-277. Accordingly, the existence of a board of police commissioners that establishes, oversees and manages the operations of a municipal police force whose expenses are borne by the town is necessary to a finding that a town has a paid municipal police department as contemplated in the statutory scheme.[16]

Although a constable may be considered a police officer under § 7-294a and may perform some of the same duties as a regular member of a paid municipal police department,[17] the two positions are fundamen-

---

[15] General Statutes § 7-276 provides: "Such boards shall have all of the powers given by the general statutes to boards of police commissioners, shall have general management and supervision of the police department of such town and of the property and equipment used in connection therewith, shall make all needful regulations for the government thereof not contrary to law and may prescribe suitable penalties for the violation of any such regulation, including suspension or removal from office of any officer or member of such police department. Such board shall have the sole power of appointment, promotion and removal of the officers and members of such police department, under such regulations as it adopts for the purpose, and such appointees shall hold office during good behavior and until removed for cause upon written charges and after hearing. The members of such police department shall have all such authority with respect to the service of criminal process and the enforcement of the criminal laws as is vested by the general statutes in police officers and constables."

[16] We note that not all police departments are established in accordance with the statutory scheme contained in chapter 104 of the General Statutes. See Board of Police Commissioners v. White, 171 Conn. 553, 562–63, 370 A.2d 1070 (1976) (police department validly created pursuant to municipal charter provisions enacted in 1861).

[17] For example, constables have the power, in their respective towns, "to serve and execute all lawful process legally directed to them"; General Statutes § 7-89; "when necessary . . . [to] command any person to assist

tally different. See General Statutes §§ 7-86 through 7-97. The statutory scheme provides that constables may be elected to a term of office; see General Statutes § 7-88; and that special constables may be appointed by the chief executive officer of a municipality; see General Statutes § 7-92; but provides that regular members of a police department are appointed and promoted[18] by the board of police commissioners under regulations adopted for that purpose, hold their positions during good behavior and are removed for cause only upon the filing of written charges and after a hearing. General Statutes § 7-276. Regular members of a municipal police department and constables thus serve under different conditions of employment.

Finally, towns that do not have a police department, including those that have constabularies, are permitted to utilize resident state troopers in meeting their law enforcement needs. General Statutes § 29-5[19] provides that towns "lacking an organized police force" may

. . . in the execution of [their] duties"; General Statutes § 7-90; and "to serve criminal process and make arrests for [the] commission of crime[s]." General Statutes § 7-92.

[18] There are no statutory provisions governing the promotion of constables.

[19] General Statutes § 29-5 provides in relevant part: "The Commissioner of Public Safety may, within available appropriations, appoint suitable persons from the regular state police force as resident state policemen in addition to the regular state police force to be employed and empowered as state policemen in any town or two or more adjoining towns *lacking an organized police force*, and such officers may be detailed by said commissioner as resident state policemen for regular assignment to such towns, provided each town shall pay sixty per cent of the cost of compensation, maintenance and other expenses of the state policemen detailed to such town, and on and after July 1, 1992, each town shall pay seventy per cent of such cost and other expenses. Such town or towns and the Commissioner of Public Safety are authorized to enter into agreements and contracts for such police services, with the approval of the Attorney General, for periods not exceeding two years. The Commissioner of Public Safety shall exercise such supervision and direction over any resident policeman so appointed as he deems necessary, and each appointee shall be *required to conform to the requirements of chapter 67. . . .*" (Emphasis added.)

procure the services of resident state policemen from the regular state police force through agreements or contracts not exceeding two years and shall pay 60 or 70 percent of their compensation and other expenses, depending on the date of the contract.

We conclude that the town does not have a paid municipal police department but, instead, has chosen to protect its residents by creating a constabulary and utilizing the services of two resident state troopers to supervise its local law enforcement operations. The legal basis for this arrangement is described in the town charter and ordinances.

Constables are employed by the town pursuant to an amended ordinance adopted in 1979 concerning the appointment and qualifications of constables. The amended ordinance vests the town board of selectmen with the sole authority to appoint constables and special constables and to prepare and to enter into agreements for their examination and training. With respect to the terms of employment, the ordinance further provides that the appointment of a constable shall terminate upon the occurrence of certain events. One such event involves *"the town['s] establish[ment] [of] a police department in accordance with the provisions of chapter 104, part I of the Connecticut General Statutes."* (Emphasis added.) Town of East Lyme, Charter Ordinances and Special Laws, Amended Ordinance Concerning Terms of Appointment and Qualifications of Constables ¶ 2.1.1.4 (amended February 20, 1979) (hereinafter Amended Ordinance Concerning Constables). There can be no plainer indication that the town is aware of the distinction between a police department and a constabulary, has chosen to establish a constabulary and knows that the continued employment of constables will not be appropriate if and when it decides to establish a police department.

In addition, the town charter authorizes the town selectmen "to enter into contracts or other agreements with the State of Connecticut, or the officials thereof, as may be necessary for the establishment of a resident State Policeman in the Town . . . ." Town of East Lyme, Charter Ordinances and Special Laws, Resolution Regarding Establishment of a Resident State Policeman in the Town of East Lyme (1998). A separate charter provision designates the first selectman as the chief of police, who may "exercise such authority as is necessary for the protection of and for the best interest of the Town . . . ." Town of East Lyme, Charter Ordinances and Special Laws, Resolution Designating the First Selectman as Town Agent to Act as Chief of Police (1998). Under these provisions, resident state troopers serve the town pursuant to a contract between the town and the state, which grants authority to the state police "to supervise and direct the operations of the appointed constables and police in the Town, including their working schedules . . . ." The contract also provides that the commissioner of public safety shall "exercise such supervision and direction over any resident police so appointed, as he deems necessary," a fact noted by the plaintiff. These contract terms are in direct conflict with the statutory mandate that, in a town with an organized police department, the board of police commissioners shall be responsible for the general management and supervision of the department. General Statutes § 7-276. Furthermore, only towns "lacking an organized police force" may utilize resident state troopers to meet their public safety needs. General Statutes § 29-5. The fact that the town has contracted for the services of resident state troopers thus indicates that the town does not have a paid municipal police department.[20]

---

[20] The concurrence states at the outset of its opinion that, although it agrees with the majority's conclusion that the plaintiff is not entitled to § 7-433c benefits because he is not a regular member of a paid municipal police department, it does not agree with the "analytical route" that the majority

Accordingly, we conclude that the plaintiff is a constable, not "a regular member of a paid municipal police department"; General Statutes § 7-433c; and, consequently, is not eligible for benefits under § 7-433c.

The plaintiff argues, however, that towns have discretion to organize police departments in any way they choose, and that the absence of a board of police commissioners has no bearing on whether the town has a police department because this court previously has construed § 7-274 as "permissive . . . ." *Board of Police Commissioners* v. *White*, 171 Conn. 553, 563, 370 A.2d 1070 (1976). We are not persuaded.

In *Board of Police Commissioners*, this court concluded that § 7-274 was "clearly permissive," and that the New Haven board of police commissioners was validly constituted because it derived its powers from city charter provisions enacted in 1861, even though its

takes in reaching that conclusion. A close examination of the concurring opinion's analysis, however, does not support this assertion.

The analysis that the concurrence employs, which can be found in the last few paragraphs of its opinion, is based on: (1) the language of the relevant statutory scheme; (2) the remedial purpose of the statute; and (3) the law enforcement arrangements adopted by the town. Notably, the majority also considers two of these factors. Indeed, the concurrence cites several of the same statutory provisions that the majority cites in concluding that there is a legislative distinction between a police department and a constabulary. See part I of this opinion, citing General Statutes §§ 7-277a (a) and (c), and 7-294a; see also part II of this opinion, citing General Statutes § 29-5.

The only significant factor considered by the concurrence that was not addressed by the majority is the remedial nature of the statute and, thus, the application of the tenet of statutory construction that the statute should be liberally construed. This is because the lack of ambiguity in the statutory scheme does not require the application of a tenet that only becomes relevant when there is some doubt as to its meaning. Indeed, because the concurrence itself finds the remedial purpose of the statute to be a nonfactor in light of "*the persuasive statutory differences between municipal policemen and constables*"; (emphasis added); we find its invocation of this particular maxim rather puzzling. That being said, we ultimately are compelled to conclude that, despite its assertion to the contrary, the concurrence essentially agrees that the meaning of § 7-433c is plain and unambiguous when considered in the context of the broader statutory scheme.

commissioners were appointed by the mayor, rather than elected, "as the later enacted § 7-274 . . . would require." Id. The court, however, was referring to the fact that, in municipalities with police departments organized pursuant to charter provisions adopted *before* the enactment of § 7-274, such as New Haven, the requirement of a board of police commissioners under § 7-274 was "permissive" in the sense that, if the town did not have such a board, it could ignore the statutory provision. *Board of Police Commissioners* therefore has no precedential value in the present context because there is no evidence in the record that the town's law enforcement operations are based on charter provisions preceding the enactment of §§ 7-274 and 7-433c.

Nevertheless, even if we assume that the existence of a board of police commissioners is not essential to a finding that a town has established a police department pursuant to chapter 104 of the General Statutes, the town has taken certain steps that only can be construed to mean that it does not have such a department. As we previously noted, these steps include the adoption of a provision in the amended ordinance regarding the termination of constables if *"the town establishes a police department in accordance with the provisions of chapter 104, part I of the Connecticut General Statutes"*; (emphasis added) Amended Ordinance Concerning Constables, supra, ¶ 2.1.1.4; and contracting with the state for the services of two resident state troopers, which is permitted by statute only if a town lacks "an organized police force . . . ." General Statutes § 29-5.

Although the plaintiff argues otherwise, the charter provision designating the first selectman as the chief of police and empowering him to "exercise such authority as is necessary for the protection of . . . the Town" does not overcome the fact that resident state troopers are responsible for the general management and super-

vision of the town's law enforcement activities and that the troopers are supervised in turn by the commissioner of public safety. The fact that the constables' duties may be similar to those of a regular member of a police department similarly fails to outweigh the fact that the town's law enforcement operations lack the bureaucratic and decision-making structure essential to a municipal police department established pursuant to chapter 104 of the General Statutes.[21]

The plaintiff claims that the town's choice of law enforcement arrangements, which do not include a board of police commissioners, cannot override the "state's edict" that municipalities with a paid, full-time police force must provide their officers with § 7-433c benefits. The plaintiff argues that the state's superseding interest in providing heart and hypertension benefits to local police officers is rooted in the nature of their work, the effect of which transcends the boundaries of a single community. The plaintiff, however, misconstrues the Heart and Hypertension Act, which, by its very terms, is applicable only to "a regular member of a paid municipal police department . . . ." General Statutes

[21] The plaintiff argues that certain municipalities without a board of police commissioners, such as New London and Groton, provide police officers with benefits under § 7-433c. See *Bergeson* v. *New London*, No. 4489 CRB-2-02-2 (February 21, 2003), aff'd, 269 Conn. 763, 850 A.2d 184 (2004); *Funaioli* v. *New London*, No. 3346 CRB-1-96-5 (November 4, 1997), rev'd, 52 Conn. App. 194, 726 A.2d 626 (1999); *Herwerth* v. *Groton*, No. 3105 CRB-2-95-6 (December 24, 1996), aff'd mem., 45 Conn. App. 922, 696 A.2d 1324 (1997); *Griffin* v. *Groton*, No. 425 CRD-2-85 (March 23, 1988); *Bucko* v. *New London*, No. 140 CRD-2-82 (December 5, 1986), aff'd, 13 Conn. App. 566, 537 A.2d 1045 (1988). The cases cited by the plaintiff, however, do not stand for the proposition that a police department may exist in the absence of a board of police commissioners. Rather, those cases were decided on other grounds. In addition, the cases do not indicate whether the alleged police departments were established under city charter provisions that were adopted prior to the enactment of §§ 7-284 and 7-433c. See footnote 16 of this opinion. Consequently, they provide no support for the plaintiff's assertion that the town has a police department within the meaning of §§ 7-284 and 7-433c, even in the absence of a board of police commissioners.

§ 7-433c. Because the law enforcement arrangements that the town has chosen to adopt do not meet that standard, we conclude that the plaintiff does not qualify for benefits under § 7-433c.

The plaintiff's final claim is that the town concedes that members of its police force are entitled to benefits under § 7-433c. The plaintiff notes that the collective bargaining agreement between the police union and the town provides that "[o]fficers collecting benefits pursuant to [§] 7-433c . . . are not eligible for [insurance] benefits . . . for disabilities covered by [§ 7-433c]." The plaintiff argues that the reference to § 7-433c benefits in the collective bargaining agreement means that such benefits are available to constables employed by the town. The plaintiff further argues that an unreported case, namely, *Smith* v. *East Lyme*, Superior Court, judicial district of New London, Docket No. 527383 (April 5, 1994) (9 C.S.C.R. 450) (*Hurley, J.*), documents the fact that the town paid § 7-433c benefits to a former constable, thus implying a concession on the part of the town that constables are eligible to receive § 7-433c benefits. We disagree.

The mere reference to "officers collecting benefits pursuant to [§] 7-433c" in a collective bargaining agreement does not establish that constables are entitled to such benefits under the law.[22] The plaintiff also mischaracterizes the *Smith* case, in which the plaintiff, Robert B. Smith, a former constable of the defendant town of East Lyme, sought damages arising out of the defendant's alleged breach of an agreement to pay the plaintiff certain disability benefits. Although, in *Smith*, the plaintiff filed a claim for benefits under § 7-433c

---

[22] The town suggests that the provision may have been included in the collective bargaining agreement to protect the town against a potential award of benefits over the town's objection or a potential demand for additional disability benefits by a constable already collecting § 7-433c benefits from a previous employer.

and entered into an agreement with the defendant pursuant to which the defendant was to compensate the plaintiff temporarily for his disability, there was no indication in that case that the defendant entered into that agreement with the understanding that it was making payments thereunder pursuant to § 7-433c.

The plaintiff strains to convince this court that constables qualify for § 7-433c benefits, without recognizing that the legislature chose to limit § 7-433c benefits to regular members of "paid municipal police department[s] . . . ." General Statutes § 7-433c; see *Stitzer* v. *Rinaldi's Restaurant*, 211 Conn. 116, 119, 557 A.2d 1256 (1989) (legislature knows how to use limiting terms when it chooses to do so). "[T]his court cannot, by judicial construction, read into legislation provisions that clearly are not contained therein." *Stitzer* v. *Rinaldi's Restaurant*, supra, 119. Accordingly, we conclude that, under the clear and unambiguous provisions of the statutory scheme, the town does not have a police department, the plaintiff cannot be considered a regular member of a paid municipal police department and, therefore, is not entitled to benefits under § 7-433c.

The decision of the board is affirmed.

In this opinion SULLIVAN, C. J., and PALMER, J., concurred.

BORDEN, J., with whom NORCOTT, J., joins, concurring. I agree with the majority that the plaintiff is not entitled to heart and hypertension benefits under General Statutes § 7-433c (a)[1] because he is not a member

---

[1] General Statutes § 7-433c provides in relevant part: "(a) Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting

of "a paid municipal police department," as required by that statute; rather, he is, as the majority aptly concludes, a member of a municipal constabulary. I do not agree, however, that the majority has taken the proper analytical route in reaching that conclusion.

There are three fundamental and closely related flaws in the majority's analysis. The first is that the majority has artificially divided one question of statutory interpretation into two purportedly separate questions, namely, "whether there is a difference between a constable and a regular member of a paid municipal police department" and "whether the town [of East Lyme] has a 'paid municipal police department' under the statutory scheme." The second flaw in the majority's analysis is

in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. If successful passage of such a physical examination was, at the time of his employment, required as a condition for such employment, no proof or record of such examination shall be required as evidence in the maintenance of a claim under this section or under such municipal or state retirement systems. The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 or the municipal or state retirement system under which he is covered, except as provided by this section, as a result of any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability. As used in this section, the term 'municipal employer' shall have the same meaning and shall be defined as said term is defined in section 7-467. . . ."

that, in its application of General Statutes § 1-2z,[2] it improperly conflates two separate analyses: (1) whether the meaning of a particular statutory term or phrase, as ascertained from "the text of the statute itself and its relationship to other statutes," is plain and unambiguous; General Statutes § 1-2z; and (2) based on such a textual analysis, what the more likely or probable—or even the most probable—meaning of that text is. The two are simply not the same. The third flaw is that, despite the majority's insistence that the statutory text is plain and unambiguous and, therefore, governed by the provisions of § 1-2z, the majority has in fact relied upon extratextual sources in ascertaining the meaning of § 7-433c (a).

Before continuing with my criticism of the majority's approach, it is useful to recall the facts of the present case. The plaintiff, Edward Genesky, is a full-time appointed, paid constable of the defendant, the town of East Lyme (town), who began his service as such in 1989. In his capacity as a constable of the town, the plaintiff was required to undergo and successfully complete training with the Connecticut Police Academy in Meriden. In that capacity, the plaintiff performs general law enforcement functions within the town. The plaintiff's powers of arrest, however, are limited, and the town does not have a lockup. Furthermore, although the plaintiff is a full-time constable, other constables serve only part-time. The first selectman of the town serves as the chief of police.

Because the plaintiff claims benefits under § 7-433c (a), and because those benefits are provided only to "a

---

[2] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

regular member of a paid municipal police department," the broad question posed by the case is whether the plaintiff is "a regular member of a paid *municipal police department*," within the meaning of § 7-433c (a). (Emphasis added.) There is no question that the plaintiff works full time as a constable and that he is paid. Therefore, the town does not contest that he is a "regular member" and that he is "paid." The more precise question, therefore, is whether, as the plaintiff contends, that membership is in a "municipal police department," within the meaning of § 7-433c (a), or, as the town contends, it is membership in something else, namely, a constabulary. That question presents the only question of statutory interpretation in this case.

As the majority acknowledges, "[t]he process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language *as applied to the facts of [the] case, including the question of whether the language actually does apply*." (Emphasis added; internal quotation marks omitted.) *Wasko* v. *Manella*, 269 Conn. 527, 534–35, 849 A.2d 777 (2004);[3] *State* v. *Courchesne*, 262 Conn. 537, 562 n.20, 816 A.2d 562 (2003). These two sentences "set forth the fundamental task of the court in engaging in the process of statutory interpretation . . . ." *State* v. *Courchesne*, supra, 562. Thus, the process of statutory interpretation necessarily involves determining the meaning of the statutory language as applied to the facts of the case; indeed, it is difficult for me to see how it could be otherwise, because that

[3] As the majority notes in footnote 10 of its opinion, § 1-2z "legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of sources of the meaning of legislative language in addition to its text." *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, 266 Conn. 706, 716 n.10, 835 A.2d 33 (2003). Thus, the legislature did not purport to overrule our judicial definition of the task of statutory interpretation.

is inevitably how a case presents a question of statutory interpretation to us. By way of illustration, the present case raises the question of whether the plaintiff, a full-time paid member of the constabulary of the town, is a member of a municipal police department within the meaning of § 7-433c (a), or, to put the same question another way, whether § 7-433c applies to the plaintiff so as to afford him heart and hypertension benefits under that statute. With this background in mind, I now turn to the three flaws in the majority's analysis.

I

The first flaw in the majority's analysis is that it has artificially divided one question of statutory interpretation into two. The crux of that flaw is contained in the following brief passage: "The plaintiff's claim that his status as a constable does not preclude him from being considered a regular member of a paid municipal police department under § 7-433c (a) requires us to examine, first, whether the statutory provisions distinguish between a constable and 'a regular member of a paid municipal police department' and, second, whether the town has a 'paid municipal police department' under the statutory scheme."

I can see absolutely no difference between these two questions insofar as they relate to the facts of this case. There is no factual dispute that the plaintiff is a paid constable of the town and that the town has no law enforcement officers other than constables. Thus, "whether the statutory provisions distinguish between a constable and 'a regular member of a paid municipal police department' "; see General Statutes § 7-433c (a); the majority's purported first question, is no different a question from "whether the town has 'a paid municipal police department' [General Statutes § 7-433c (a)] under the statutory scheme," the majority's purported second question. Both questions are the same question of statu-

tory interpretation, because they both require us to decide whether the plaintiff, a constable, is a member of a "municipal police department" within the meaning of § 7-433c (a); and they both require us to decide that question by deciding whether the language of § 7-433c (a) applies to the facts of the case.

Furthermore, the majority answers this first question of statutory interpretation without any reference to the facts of the case.[4] Absent from this analysis is any

[4] The majority, in footnote 14 of its opinion, claims that my "suggestion that we interpret a statute by seeking guidance from the facts of the case turns the process of statutory interpretation on its head. If the facts of a case were used to determine the meaning of any given statutory provision, there would be an infinite number of possible interpretations of the statute, depending on the circumstances of the case."

I suggest, in response, first, that the majority ignores this court's own—and the majority's own acknowledged—definition of statutory interpretation: "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." *Wasko* v. *Manella*, supra, 269 Conn. 534–35; see also part I of the majority opinion. Thus, I do not interpret a statute by "seeking guidance from the facts of the case . . . ." I simply do what our precedents require: I seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of the case, including the question—as in the present case—of whether the statute does apply to the facts of the case. This does not turn the process of statutory interpretation on its head; it performs that process.

Second, the appropriate analytical process, which I advocate in this concurring opinion, of interpreting a statute as applied to the facts of the case, is the approach that we have always taken to statutory interpretation, both before and after the enactment of § 1-2z, and that approach has not resulted in, nor will it result in "an infinite number of possible interpretations of the statute, depending on the circumstances of the case." See footnote 14 of the majority opinion. On the contrary, the necessarily factually contextual approach to the interpretation of statutes simply means that, depending on the statute, there may be a very large—or very small—number of *questions* that parties may present under any given statute or statutory scheme and any given set of facts. But the answers to those questions will always be finite and consistent, if the court answers them by performing the process of statutory interpretation defined previously in an intellectually honest manner.

acknowledgment of the facts—favorable to the plaintiff's interpretation of the statute—that constables in the town have law enforcement duties, including a limited power of arrest, that the first selectman is the chief of police, and that the plaintiff was required to go through the state police training course in order to be a constable in the town. Surely, these facts are at least *relevant* to the process of statutory interpretation, which involves determining the meaning of the statutory language as applied to the facts of the case.

Indeed, that there is simply no difference between these questions is vividly demonstrated by the majority's answer to the first question: "Accordingly, we conclude that related statutory provisions clearly distinguish between members of a local police department and constables, *and that constables were not intended to come within the class of persons eligible for benefits under § 7-433c.*" (Emphasis added.) Based on this conclusion—that constables are not intended to come within the scope of § 7-433c (a)—clearly, this case is over and the plaintiff loses, because the plaintiff is a constable.

I can see no substantive difference between the majority's answers to its purported second question and its answer to its purported first question. Compare: "statutes pertaining to the organization and function of police departments and constabularies, when applied to the facts of this case as found by the commissioner, firmly establish that the town has a constabulary," rather than a "paid municipal police department"; and "the plaintiff is a constable, not a 'regular member of a paid municipal police department' . . . and, consequently, is not eligible for benefits under § 7-433c" (the majority's answers to its purported second question); (citation omitted); with "related statutory provisions clearly distinguish between members of a local police department and constables, and that constables were

not intended to come within the class of persons eligible for benefits under § 7-433c" (the majority's answer to its purported first question). If there is a substantive difference among any of the majority's formulations of the questions or among these answers, that difference wholly escapes me.

The nub of each question is: Is the plaintiff, who is a member of the town constabulary, a member of a "municipal police department" within the meaning of § 7-433c (a)? The nub of each answer is: No; a member of a constabulary like that of the town is not a member of a "municipal police department" within the meaning of § 7-433c (a). No amount of linguistic torture of this single question and this single answer into two questions and answers can change those facts.

Why, then, does the majority formulate the second question, when it has already purported to resolve the only issue in the case pursuant to the first question? Apparently, the majority, in answering the second question, somehow feels free to use extratextual sources in engaging in the process of statutory interpretation. Thus, the artificial bifurcation of one question into two creates the appearance that the present case involves two different types of questions to which the majority may apply two different modes of analysis. I discuss this in more detail in part III of this concurring opinion. Suffice it to say that both questions are questions of statutory interpretation, and I do not read the majority opinion to disagree with that characterization.

## II

The second flaw in the majority's analysis is that, in its application of § 1-2z, it improperly conflates two separate questions: (1) whether the meaning of a particular statutory term or phrase, as ascertained from "the text of the statute itself and its relationship to other statutes," is plain and unambiguous; General Statutes

§ 1-2z; and (2) based on such a textual analysis, what the more likely or probable—or even the most probable—meaning of that text is. This conflationary flaw results in a transformation of the plain meaning rule from a threshold determination of ambiguity into the following result: once the majority has examined the statutory texts and arrived at a conclusion as to a probable meaning on the basis of those texts, that meaning then becomes, ex post facto, plain and unambiguous, precluding any resort to extratextual sources of the meaning of that text under § 1-2z. That is precisely what the majority opinion has done. Moreover, in doing so the majority has failed to demonstrate, as § 1-2z requires, that the statutory language in question is plain and unambiguous.

Instead, the first analysis noted previously—namely, whether the meaning of the text is plain and unambiguous—requires that the court examine all of the relevant statutes and conclude that there is but *one* reasonable meaning conveyed by those statutes. This inquiry, however, is *not* whether, after that full, factually contextual analysis of the statutory language, the court is convinced of the correctness of one party's interpretation; it is whether the other party's interpretation lacks *any* plausibility. Put another way, in order to reach the initial conclusion of a lack of ambiguity, the court must first conclude, not what the likely or probable or even most probable meaning of the statute is after a full textual analysis, but that there is only one reasonable meaning and that any other meaning is simply not plausible or tenable.

For example, in order for the majority to conclude that § 7-433c (a) plainly and unambiguously does not apply to the plaintiff under the facts of the present case, the majority must first determine that any interpretation of § 7-433c (a), taken together with all other relevant statutes, that would apply it to the plaintiff, is not rea-

sonable or plausible. As I demonstrate later in this concurring opinion, there is a quite reasonable interpretation of the relevant statutes that yields an interpretation that § 7-433c (a) applies to the plaintiff.

Section 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Thus, pursuant to § 1-2z, we are to go through the following initial steps in interpreting statutes: first, we consider only the text of the statute at issue and its relationship to other statutes, as applied to the facts of the case; second, if after the completion of step one, having confined ourselves to the text of the relevant statutes, we conclude that, as so applied, there is but one reasonable or plausible meaning of the statutory language, we stop there; but third, if after the completion of step one, we conclude that, as applied to the facts of the case, there is more than one reasonable or plausible meaning of the statute, we may consult other sources, beyond the statutory language, to ascertain the meaning of the statute as applied to the facts of the case.

It is useful to remind ourselves of what, in this context, we mean when we say that a statutory text has a "plain meaning," or, what is the same, a "plain and unambiguous" meaning. This court has already defined that phrase. "By that phrase we mean the meaning that is so strongly indicated or suggested by the language as applied to the facts of the case, without consideration, however, of its purpose or the other, extratextual sources of meaning . . . that, when the language is read as so applied, it appears to be *the* meaning and appears to preclude any other likely meaning." (Empha-

sis in original.) *State* v. *Courchesne,* supra, 262 Conn. 573 n.30. Put another way, if the text of the statute at issue, considering its relationship to other statutes, as applied to the facts of the case, would permit more than one likely or plausible meaning, its meaning cannot be said to be "plain and unambiguous." In my view, the analysis of the statutory language at issue in the present case by the majority fails this test.

First, I turn to the language at issue that is most relevant, namely, the language of § 7-433c (a) as applied to the facts of this case. That language is "municipal police department . . . ." General Statutes § 7-433c (a). If we look at each word separately, and apply each to the relevant facts, there is an interpretation that quite reasonably favors the plaintiff. The town is certainly a municipality; therefore, "municipal" is satisfied. The constabulary of the town performs law enforcement functions, including a limited power to arrest, and the first selectman serves as the "chief of police"; therefore, "police" is satisfied. The constabulary is certainly a constituent part of the government of the town; there-fore, "department"—and even "police department"—is satisfied. Furthermore, there is nothing in the other statutes considered by the majority that would neces-sarily exclude this quite straightforward application of the ordinary meaning of the text of § 7-433c (a) to the facts of the case. Therefore, solely on the basis of this reading of the relevant statutory texts, there is a reason-able interpretation of § 7-433c (a) that favors the plain-tiff's claim that § 7-433c (a) applies to him so as to afford him heart and hypertension benefits.

Second, we have stated that "all workers' compensa-tion legislation, because of its remedial nature, should be broadly construed in favor of disabled employees . . . [and that] [t]his proposition applies as well to the provisions of [§] 7-433c . . . ." (Citations omitted.) *Szudora* v. *Fairfield,* 214 Conn. 552, 557, 573 A.2d 1

(1990). Thus, this prior judicial interpretive maxim regarding § 7-433c supports a broad interpretation of the phrase "municipal police department" as applied to the facts of the present case, and such a broad interpretation reasonably would include a full-time, paid constable of the town.[5]

Third, the majority concedes that none of our statutes, including § 7-433c (a), contains a definition of "paid municipal police department." In addition, a canvass of our General Statutes indicates that, in addition to its use in § 7-433c (a), the term "municipal police department," without any statutory definition thereof, has been used by the legislature at least twenty-eight times,[6] and that some uses of the term probably would

---

[5] I am cognizant, however, that, under the restrictions imposed by § 1-2z, we are prohibited from examining extratextual sources of the meaning of statutory language unless and until we have, *first*, determined that it is plain and unambiguous. It may be, therefore, that under the terms of § 1-2z themselves, we may not even consult our prior interpretive maxims such as that stated in *Szudora*, in order to determine whether the language is ambiguous, because that maxim does not appear anywhere in the text of the statute. I note also that the majority does not anywhere in its opinion refer to this judicially well established maxim. I suspect that it does not do so for precisely this reason, namely, its view that § 1-2z prohibits it. If it be so, however, that § 1-2z has this effect—which its text certainly suggests— then it seems to me that it might well be unconstitutional under the doctrine of the separation of powers, at least as to that effect, and perhaps more broadly, as a statute that significantly interferes with the core judicial task of statutory interpretation. See *State* v. *McCahill*, 261 Conn. 492, 505–506, 811 A.2d 667 (2002).

[6] See General Statutes § 1-217 (residential addresses exempt from disclosure under Freedom of Information Act); General Statutes § 5-145c (eligibility of inspectors in division of criminal justice for heart and hypertension benefits); General Statutes § 7-281a (access to Connecticut On-Line Law Enforcement Communications Teleprocessing System); General Statutes § 7-282c (filing and dissemination of missing child reports); General Statutes § 7-282d (prohibition on quotas for traffic tickets); General Statutes § 7-294f (requirement of course on rape crisis intervention as part of police training program); General Statutes § 7-294g (requirement of training on subjects of domestic violence, recognition and management of child abuse and suicide intervention procedures); General Statutes § 7-294h (requirement of training relative to handling of juvenile matters); General Statutes § 7-294*l* (requirement of training on gang related violence); General Statutes § 7-294n (require-

and others probably would not include a constabulary like that of the town, depending on the statutory context and the facts of the case.[7] Indeed, the fact that the statutory phrase in question has been used so many times and in so many different contexts, suggests two things. First, the frequent and varied use of the term strongly suggests that it cannot be "plain and unambiguous" in any one context; it must be interpreted in accordance with that context, and in accordance with the purpose for which it was used in any given context. Put another way, it is difficult, perhaps impossible, for me to look at a statutory phrase that is used, without definition, *twenty-nine* times, in *twenty-nine* different

---

ment of training relative to crimes motivated by bigotry or bias); General Statutes § 7-294y (requirement of written policy regarding handling of juvenile matters); General Statutes § 8-265mm (c) (eligibility for pilot program of home purchasing assistance); General Statutes § 10-233h (obligation to notify superintendent of schools of arrest of student); General Statutes § 14-10 (e) (limitation to business address on request for motor vehicle records); General Statutes § 14-152 (report of theft or recovery of motor vehicle); General Statutes § 14-227b (m) (payment of physician's charges for taking blood test for driving under influence); General Statutes § 15-140q (c) (payment of physician's charges for taking blood sample for purposes of certain criminal prosecutions); General Statutes § 17a-185 (transportation of person age sixteen or seventeen in need of shelter or care); General Statutes § 21a-36 (c) (exemption from requirement of vending machine operator's license); General Statutes § 21a-161c (requirement of written notice of assignment of licensed watchman, guard or patrol service person); General Statutes § 22a-2 (b) (authorized designee of commissioner of environmental protection); General Statutes § 28-1 (5) (definition of " '[c]ivil preparedness forces' "); General Statutes § 29-154a (1) (qualifications for license as private detective or investigator, watchman, guard or patrol service person); General Statutes § 31-48c (prohibition against hiring of municipal police during labor dispute); General Statutes § 53a-115 (tampering with telecommunications system operated by municipal police department is criminal mischief); General Statutes § 54-1*l* (prohibition against racial profiling); General Statutes § 54-1m (requirement of written policy against stopping of persons based on race, color, ethnicity, age, gender or sexual orientation); General Statutes § 54-86j (prohibition against requiring polygraph of victims of sexual assault).

[7] I need not go through all twenty-eight of these statutory examples to determine which would and which would not likely include constables. A brief glance at them, however, clearly indicates that some likely would and others likely would not.

contexts, and say with any degree of confidence that in this one context it is plain and unambiguous as applied to the facts of the present case. A second, corollary conclusion is that, in arriving at its implicit conclusion that the statutory language of § 7-433c (a), considering its relationship to other relevant statutes, is plain and unambiguous, the majority cannot have considered these statutes and analyzed them as statutes that are certainly relevant to the use of the same language in § 7-433c (a).

Fourth, the majority's analysis, including its answers to its purported second question, takes up approximately two thirds of its opinion. It is simply counterintuitive that it would take that much analysis and discussion to arrive at the meaning, as applied to the facts of the case, of a three word term—"municipal police department"—if that meaning were truly plain and unambiguous.

Thus, all these factors convince me that the meaning of the term, "municipal police department," as used in § 7-433c (a) and as applied to the facts of the case, is not plain and unambiguous. This litany of factors demonstrates that the meaning of the term, wherever used, can properly be discerned only by a careful analysis of its use in the particular statutory text at issue and of other statutory texts, along with any other relevant nontextual sources of meaning, and that it is not a term the meaning of which as so used and as applied to the facts of the case is plain and unambiguous.

Instead of attempting to demonstrate, first, that the text of § 7-433c (a), including its relationship to other statutes, has only *one* reasonable or plausible meaning as applied to the facts of the case, the majority has simply examined the text of § 7-433c (a) and of certain other statutes and arrived at a conclusion as to its

meaning. That meaning, then, has become, ex post facto, the only reasonable meaning.

The bases of the majority's conclusion are that, although the term "municipal police department" is not defined anywhere, either in § 7-433c (a) or elsewhere, the legislature has often referred "in other statutory provisions to constables *and* members of a local police department," and the legislature has in other statutes made certain benefits available to the "surviving spouse and certain dependent children of a member of an organized local police department *or* a constable who performs criminal law enforcement duties." (Emphasis in original.) Thus, the majority concludes, in answering its purported first question, "that constables were not intended to come within the class of persons eligible for benefits under § 7-433c."

I agree that this statutory analysis presents persuasive reasons why § 7-433c (a) does not apply to the plaintiff. My disagreement is over whether that statutory analysis establishes that the majority's interpretation is the *only reasonable meaning* of the text of § 7-433c (a) and that, therefore, resort to extratextual sources of its meaning is precluded by § 1-2z. The majority apparently thinks that it is. In my view, for the reasons I have explained previously in this concurring opinion, it is not. There remains a quite reasonable interpretation of the statutory language that, if followed, would apply § 7-433c (a) to the plaintiff. "[W]e have stated that statutory language does not become ambiguous 'merely because the parties contend for different meanings.' . . . *Glastonbury Co.* v. *Gillies*, 209 Conn. 175, 180, 550 A.2d 8 (1988). Yet, if parties contend for different meanings, and each meaning is plausible, that is essentially what 'ambiguity' ordinarily means in such a context in our language." *State* v. *Courchesne*, supra, 262 Conn. 571–72.

Indeed, the majority's treatment of its purported second question demonstrates that, despite its efforts to view this case as one to which § 1-2z applies, it, too, albeit implicitly, uses extratextual sources in interpreting § 7-433c (a). This brings me to the third fundamental flaw in the majority opinion.

## III

The third fundamental flaw in the majority's analysis is that, despite its insistence that the statutory language is plain and unambiguous, and that, therefore, under § 1-2z it is prohibited from using extratextual sources in interpreting § 7-433c (a), it does in fact use those extratextual sources. These sources include the town charter and ordinances, the collective bargaining agreement between the police union and the town, and the canon of statutory interpretation that the "legislature knows how to use limiting terms when it chooses to do so . . . [and] [t]his court cannot, by judicial construction, read into legislation provisions that are not contained therein." (Internal quotation marks omitted.) See part II of the majority opinion, quoting *Stitzer* v. *Rinaldi's Restaurant*, 211 Conn. 116, 119, 557 A.2d 1256 (1989).[8] In addition, although specifically declining to "rely on *Zimmer* [v. *Essex*, 38 Conn. Sup. 419, 421, 449 A.2d 1053 (1982)], as precedent," the majority "note[s] that the court in *Zimmer* interpreted [§] 7-433c and [General Statutes §] 7-24 under facts similar to those in the present case" in a manner consistent with the majority's conclusion. See footnote 6 of the majority opinion. Section 1-2z does not say that a court may not *rely for support* on extratextual evidence of a statute's

[8] But see, e.g., *State* v. *Ellis*, 197 Conn. 436, 445, 497 A.2d 974 (1985) ("This court does not interpret statutes in a vacuum, nor does it refuse to consider matters of known historical fact. When aid to the meaning of a statute is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination." [Internal quotation marks omitted.]); *Brown's Appeal*, 72 Conn. 148, 150, 44 A. 22 (1899) (same).

meaning; it says that we may not "consider" such evidence. I suggest that the majority's "note" of *Zimmer*'s conclusion consistent with that of the majority, constitutes such consideration.

My point is that none of these materials, considered and employed by the majority, is contained in the text of the statute at issue and they are, therefore, presumably barred from our consideration by the literal terms of § 1-2z. Indeed, it is telling that the majority cannot *decide* the case without answering its purported *second* question and, in doing so, considering extratextual sources of the meaning of § 7-433a as applied to the facts of this case.

The majority's response to this point is as follows: "The majority does not use the charter and ordinances to determine what a police department *is*. Rather, the majority uses them to determine whether the town's law enforcement agency is a constabulary or a police department under the relevant statutes." (Emphasis in original.) See footnote 14 of the majority opinion. This response is a red herring, and only proves my point.

It is a red herring because I do not suggest that the majority is determining "what a police department *is*." (Emphasis in original.) Such a metaphysical question has no relevance to the present case. What a police department "is" is a meaningless question, unless it is linked to a particular statute and the facts of the case, such as in the present case, namely, whether the town constabulary "is" a "municipal police department" within the meaning of § 7-433c (a).

The majority's response proves my point, because it acknowledges that it "uses [the town charter and ordinances] *to determine whether the town's law enforcement agency is a constabulary or a police department under the relevant statutes.*" (Emphasis added.) See footnote 14 of the majority opinion. That

is an accurate description of the question of statutory interpretation posed by the majority's questions in the present case. Thus, the majority acknowledges that it uses the town charter and ordinances—which are not included in the text of any of the relevant statutes—to decide whether § 7-433c (a) applies to the facts of this case.

## IV

I reiterate that I do not disagree with the ultimate conclusion of the majority that the town's law enforcement agency is a constabulary and not a municipal police department, as that term is used in § 7-433c. Such a conclusion, however, is not plainly and unambiguously compelled by the texts and facts involved in the majority's analysis and discussion, as I have indicated previously in this concurring opinion.

Thus, in order to decide the present case, I would instead recognize that the question of whether the plaintiff is a member of a "municipal police department" within the meaning of § 7-433c (a) presents a singular question of statutory interpretation, the answer to which is not clear or obvious from the language of that statute and other statutes. Put another way, considering both the text of § 7-433c (a) itself and the text of other relevant statutes, the meaning of that term as applied to the facts of the case is not plain and unambiguous. Consequently, the limitations imposed on our analytical method by § 1-2z do not apply.

I would, therefore, start with the language of the statute but would not confine myself only to that language. I would also consider other nontextual sources of its meaning, namely, our prior jurisprudence regarding the statute's remedial purpose, the proper role of maxims of statutory interpretation, and what we know as a matter of history regarding towns served by a constabulary. Without belaboring the point, this mode

of analysis leads me to conclude, along with the majority, that under the facts of the present case the plaintiff is a member, not of a "municipal police department" within the meaning of § 7-433c (a), but of a constabulary.

First, the language of the relevant statutory scheme suggests that, despite the fact that constables perform many of the same functions as other law enforcement officers and, therefore, might be considered for some purposes as members of a municipal police department, the legislature has often considered constables and policemen as similar but different officers. As both I and the majority have already noted, the term, "municipal police department," is nowhere defined in our statutes. Other related statutes, however, indicate a legislatively understood difference between a police department and a constabulary. For example, General Statutes § 7-277a (a)[9] provides a mechanism by which the chief execu-

[9] General Statutes § 7-277a provides: "(a) The chief executive officer of any town, city or borough or his designee may, whenever he determines it to be necessary in order to protect the safety or well-being of his municipality, request the chief executive officer of any other town, city or borough to furnish such police assistance as is necessary to meet such situation and the chief executive officer, or chief of police or board of police commissioners or other duly constituted authority with the approval of the chief executive officer of the municipality receiving such request may, notwithstanding any other provision or requirement of state or local law, assign and make available for duty in such other municipality, under the direction and command of an officer designated for the purpose, such part of the police forces under his control as he deems consistent with the safety and well-being of his municipality. Any policeman so provided, while acting in response to such request, shall have the same powers, duties, privileges and immunities as are conferred on the policemen of the municipality requesting assistance. Unless waived in writing by the chief executive officer of the municipality supplying assistance pursuant to a request under this section, such municipality shall be reimbursed for all expenditures incurred in providing such assistance by the municipality making such request, including payments for death, disability or injury of employees and losses or damages to supplies or equipment incurred in providing such assistance. Any municipality, upon the approval of the chief executive officer and, where required by charter or ordinance, the governing body of such municipality, may enter into an agreement with any other municipality or municipalities, with respect to

tives of municipalities may request police assistance from other municipalities. Section 7-277a (c) specifically provides, however, that the "chief executive officer" of any municipality "which provides police protection *solely by a constabulary force* may enter into an agreement with one or more municipalities to furnish or receive police assistance under the conditions and terms specified in subsection (a)." (Emphasis added.) Similarly, General Statutes § 7-294a,[10] which

requesting and supplying such assistance and reimbursing or receiving reimbursement for the same.

"(b) The chief executive officer of any institution which maintains a special police force, established under the provisions of section 10a-142, and the chief of police of the Office of State Capitol Police, established under the provisions of section 2-1f, may enter into an agreement with one or more municipalities to furnish or receive police assistance under the same conditions and terms specified in subsection (a) for agreements between municipalities.

"(c) The chief executive officer of any town, city or borough which provides police protection solely by a constabulary force may enter into an agreement with one or more municipalities to furnish or receive police assistance under the conditions and terms specified in subsection (a)."

[10] General Statutes § 7-294a provides: "As used in this section and sections 7-294b to 7-294e, inclusive, 'academy' means the Connecticut Police Academy; 'applicant' means a prospective police officer who has not commenced employment or service with a law enforcement unit; 'basic training' means the minimum basic law enforcement training received by a police officer at the academy or at any other certified law enforcement training academy; 'certification' means the issuance by the Police Officer Standards and Training Council to a police officer, police training school or to a law enforcement instructor of a signed instrument evidencing satisfaction of the certification requirements imposed by section 7-294d, and signed by the council; 'council' means the Police Officer Standards and Training Council; 'Governor' includes any person performing the functions of the Governor by authority of the law of this state; 'review training' means training received after minimum basic law enforcement training; 'law enforcement unit' means any agency, organ or department of this state or a subdivision or municipality thereof, whose primary functions include the enforcement of criminal or traffic laws, the preservation of public order, the protection of life and property, or the prevention, detection or investigation of crime; 'police officer' means a sworn member of an organized local police department, an appointed constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, 29-18a or 29-19 or any member of a law enforcement unit who performs police duties; 'probationary candidate'

sets forth the definitions for purposes of the police officer standards and training council, defines a " 'police officer' " as "a sworn member of an organized local police department, [as well as] *an appointed constable*[11] *who performs criminal law enforcement duties* . . . ." (Emphasis added.) In addition, General Statutes § 29-5[12] provides for the appointment by the commissioner of public safety of resident state troopers for towns "lacking an organized police force . . . ." We know as a matter of history—i.e., a nontextual source of the meaning of the statutory scheme—that, as the town in the present case points out, such towns have usually been towns served by a constabulary. See, e.g., *Bieluch* v. *Sullivan*, 999 F.2d 666, 668 (2d Cir. 1993), cert. denied, 510 U.S. 1094, 114 S. Ct. 926, 127 L. Ed. 2d 219 (1994); *Zimmer* v. *Essex*, supra, 38 Conn. Sup. 420. Although the language "organized police force" is not identical to "municipal police department," it is close enough to conclude that the two legislative terms are synonymous or nearly so.

This analysis suggests that there is a legislatively recognized difference between a municipal police

means a police officer who, having satisfied preemployment requirements, has commenced employment with a law enforcement unit but who has not satisfied the training requirements provided for in section 7-294d; 'school' means any school, college, university, academy or training program approved by the council which offers law enforcement training and includes a combination of a course curriculum, instructors and facilities."

[11] Some constables are elected, rather than appointed. See General Statutes § 7-88.

[12] General Statutes § 29-5 provides in relevant part: "The Commissioner of Public Safety may, within available appropriations, appoint suitable persons from the regular state police force as resident state policemen in addition to the regular state police force to be employed and empowered as state policemen in any town or two or more adjoining towns lacking an organized police force, and such officers may be detailed by said commissioner as resident state policemen for regular assignment to such towns, provided each town shall pay sixty per cent of the cost of compensation, maintenance and other expenses of the state policemen detailed to such town, and on and after July 1, 1992, each town shall pay seventy per cent of such cost and other expenses. . . ."

department and a constabulary. Although we have characterized § 7-433c as remedial and, therefore, to be broadly construed; *Szudora* v. *Fairfield*, supra, 214 Conn. 557; we have also stated that "[a]xioms such as this . . . cannot displace the need for careful and thoughtful interpretation of [the statutory provisions at issue], nor can they displace the firm conclusions that such a process of interpretation yields. [Such] axioms, like all rules or canons of statutory construction, serve as important guidelines to the determination of legislative meaning. To permit them to displace the conclusions that careful interpretation yields, however, would be a disservice to the legislative process, as well as to the judicial exercise of interpreting legislative language based upon the premise that the legislature intends to enact reasonable public policies." (Internal quotation marks omitted.) *Carriero* v. *Naugatuck*, 243 Conn. 747, 762, 707 A.2d 706 (1998). Thus, the fact that the statute is remedial is simply insufficient to overcome the persuasive statutory differences between municipal policemen and constables. The repeated legislative distinction drawn between police departments and constabularies indicates that the plaintiff does not come within the category of municipal policeman.

In addition, I also consider the extratextual sources of the town charter and ordinances, and the collective bargaining agreement between the town and the police union. I conclude that the language of the 1979 town ordinance supports the conclusion that the plaintiff is not a member of a municipal police department, because it provides for the termination of the town constabulary if "the town establishes a police department in accordance with the provisions of chapter 104, part I of the Connecticut General Statutes." Town of East Lyme, Charter Ordinance and Special Laws, Amended Ordinance Concerning Terms of Appointment and Qualifications of Constables ¶ 2.1.1.4 (February 20,

1979). With respect to the collective bargaining agreement, I acknowledge that it lends support to the *plaintiff's* claim, because it specifically refers to § 7-433c, but I conclude that that support is not persuasive enough to overcome all of the other factors leading to the opposite conclusion.

Finally, I note that, under all of the facts of the case, although the plaintiff has law enforcement duties, the plaintiff's powers of arrest are limited, and the town does not have a lockup, which is an ordinary hallmark of a "police department." Further, although the plaintiff is a full-time constable, other members of the constabulary serve only part-time, a status that seems inconsistent with the notion of a "municipal police department." Moreover, although the first selectman serves as the town's chief of police, the resident state trooper has administrative supervision over the plaintiff. Those facts support the conclusion that the plaintiff is a member, not of a "municipal police department" within the meaning of § 7-433 (a), but of a local constabulary.

I would, therefore, affirm the decision of the workers' compensation review board affirming the decision of the workers' compensation commissioner dismissing the plaintiff's claim for benefits under § 7-433c (a).