JEROME KINSEY *v.* PACIFIC EMPLOYERS
INSURANCE COMPANY
(SC 17182)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued January 7, 2005—officially released March 7, 2006

*Philip T. Newbury, Jr.*, with whom, on the brief, was *Martha A. Shaw*, for the appellant (defendant).

*Alan Scott Pickel*, for the appellee (plaintiff).

*Opinion*

PALMER, J. The defendant, Pacific Employers Insurance Company, appeals from the judgment of the trial court confirming an arbitration decision in favor of the plaintiff, Jerome Kinsey. This case arises out of an automobile accident in which the plaintiff, who was operating a vehicle owned by his employer and insured under a commercial fleet automobile insurance policy issued by the defendant, sustained injuries that were caused by an underinsured motorist. The sole issue in this appeal is whether the trial court properly concluded that a written request by the plaintiff's employer for a reduction in uninsured and underinsured motorist coverage under its commercial fleet policy was ineffective because certain language in the informed consent form in which the request was made was not in twelve-point type as required by General Statutes § 38a-336 (a) (2).[1] We conclude that the trial court improperly

[1] General Statutes § 38a-336 (a) provides: "(1) Each automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to section 38a-334, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages, because of bodily injury, including death resulting therefrom. Each insurer licensed to write automobile liability insurance in this state shall provide uninsured and underinsured motorists coverage with limits requested by any named insured upon pay-

determined that the written request for a reduction in uninsured and underinsured motorist coverage was ineffective and, therefore, reverse the judgment of the trial court.

The relevant facts and procedural history are undisputed. On or about November 21, 2000, the plaintiff was injured when the vehicle that he was driving in Ardsley, New York, was struck by an automobile driven

ment of the appropriate premium, provided each such insurer shall offer such coverage with limits that are twice the limits of the bodily injury coverage of the policy issued to the named insured. The insured's selection of uninsured and underinsured motorist coverage shall apply to all subsequent renewals of coverage and to all policies or endorsements which extend, change, supersede or replace an existing policy issued to the named insured, unless changed in writing by any named insured. No insurer shall be required to provide uninsured and underinsured motorist coverage to (A) a named insured or relatives residing in his household when occupying, or struck as a pedestrian by, an uninsured or underinsured motor vehicle or a motorcycle that is owned by the named insured, or (B) any insured occupying an uninsured or underinsured motor vehicle or motorcycle that is owned by such insured.

"(2) Notwithstanding any provision of this section to the contrary, each automobile liability insurance policy issued or renewed on and after January 1, 1994, shall provide uninsured and underinsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless any named insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. Such written request shall apply to all subsequent renewals of coverage and to all policies or endorsements which extend, change, supersede or replace an existing policy issued to the named insured, unless changed in writing by any named insured. No such written request for a lesser amount shall be effective unless any named insured has signed an informed consent form which shall contain: (A) An explanation of uninsured and underinsured motorist insurance approved by the commissioner; (B) a list of uninsured and underinsured motorist coverage options available from the insurer; and (C) the premium cost for each of the coverage options available from the insurer. Such informed consent form shall contain a heading in twelve-point type and shall state: 'WHEN YOU SIGN THIS FORM, YOU ARE CHOOSING A REDUCED PREMIUM, BUT YOU ARE ALSO CHOOSING NOT TO PURCHASE CERTAIN VALUABLE COVERAGE WHICH PROTECTS YOU AND YOUR FAMILY. IF YOU ARE UNCERTAIN ABOUT HOW THIS DECISION WILL AFFECT YOU, YOU SHOULD GET ADVICE FROM YOUR INSURANCE AGENT OR ANOTHER QUALIFIED ADVISER.' "

by Oscar Rosas. The vehicle operated by the plaintiff was owned by his employer, Friedkin Companies, Inc. (Friedkin), a corporation with over 2700 employees, and was insured under a commercial fleet automobile insurance policy issued to Friedkin by the defendant. More than 1000 vehicles were covered under the policy.[2] The vehicle operated by Rosas was insured under an automobile insurance policy with liability limits of $30,000.

After exhausting the liability limits of Rosas' policy, the plaintiff asserted a claim for underinsured motorist benefits under Friedkin's policy, which provided liability coverage of $1 million. The plaintiff maintained that, because, under General Statutes § 38a-336 (a) (2), "each automobile liability insurance policy . . . shall provide uninsured and underinsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law," he was entitled to underinsured motorist coverage up to the limit of $1 million. The defendant disagreed, claiming that the total amount of underinsured motorist coverage available under Friedkin's policy was $40,000, less any amount that the plaintiff had recovered under Rosas' policy. The defendant predicated its claim on the fact that, prior to the date of the accident in which the plaintiff was injured, Friedkin had submitted to the defendant an "Informed Consent Form," signed by Mary E. Isbell, Friedkin's vice president of risk, requesting that its uninsured and underinsured motorist coverage limit be reduced to $40,000. Although acknowledging that

---

[2] We note that, in addition to Friedkin, four individuals and fifty-nine other business entities were named insureds under the commercial fleet policy that Friedkin had purchased from the defendant. Neither party, however, claims that the existence of those additional insureds has any bearing on the issue raised by this appeal, namely, whether Friedkin's request for a reduction in uninsured and underinsured motorist coverage under that policy was ineffective.

Friedkin had submitted a request for a reduction in coverage, the plaintiff maintained that the request was ineffective because the informed consent form in which Friedkin had made the request did not comply with § 38a-336 (a) (2). In particular, § 38a-336 (a) (2) requires the inclusion of certain language, in the form of a heading in twelve-point type, on the informed consent form;[3] it is undisputed that the form that Friedkin had submitted contained the required language, albeit in eight-point type rather than twelve-point type.[4]

The plaintiff commenced an action in the Superior Court seeking to compel the defendant to proceed with arbitration of the parties' coverage dispute in accordance with the terms of Friedkin's policy. The parties subsequently agreed to submit the dispute for resolution by a single arbitrator. The unrestricted arbitration submission provided that "the [a]rbitrator shall determine whether the informed consent form is in accordance with the requirements of . . . § 38a-336 (a) (2) and determine the applicable amount of [u]nderinsured [m]otorist [c]overage available to [the] [p]laintiff pursuant to [Friedkin's] policy . . . . After [this] determination . . . a second hearing will be had, if necessary, concerning damages and the award of underinsured motorist benefits to the plaintiff . . . ." The arbitrator thereafter rendered a decision in which he concluded that "the informed consent form [in which Friedkin had made its request for a reduction in uninsured and underinsured motorist coverage] fails to comply with the statutory requirements of [§ 38a-336 (a) (2)] in that the typeface of the required [heading] is not in twelve . . . point type." The arbitrator further concluded that Friedkin's "election for lower [uninsured and underin-

---

[3] We sometimes refer to this statutorily mandated language as the heading.

[4] The heading was not at the top of the consent form but, rather, at the bottom of that form. The plaintiff, however, raises no issue concerning the location of the heading.

sured motorist coverage] . . . is invalid and the applicable . . . underinsured motorist coverage is [$1 million] less applicable set offs."

Thereafter, the defendant filed a motion to vacate the arbitrator's decision. The defendant claimed that, under the circumstances, strict compliance with the typeface requirement of § 38a-336 (a) (2) was neither necessary nor appropriate because that requirement was intended to benefit individual consumers rather than sophisticated corporate entities such as Friedkin, which is insured under a commercial fleet automobile insurance policy. The trial court rejected the defendant's contention, denied the defendant's motion to vacate and rendered judgment confirming the arbitrator's decision. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.[5]

This case presents an issue of statutory construction, and, therefore, our review is plenary. E.g., *Wiseman* v. *Armstrong*, 269 Conn. 802, 809, 850 A.2d 114 (2004).

---

[5] We note, preliminarily, that "[t]he standard of review for arbitration awards is determined by whether the arbitration was compulsory or voluntary. This court recognized the fundamental differences between voluntary and compulsory arbitration in *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 190–91, 530 A.2d 171 (1987). The court concluded therein that 'whe[n] judicial review of compulsory arbitration proceedings required by [§ 38a-336 (c)] is undertaken . . . the reviewing court must conduct a de novo review of the interpretation and application of the law by the arbitrators. The court is not bound by the limitations contractually placed on the extent of its review as in voluntary arbitration proceedings.' Id., 191. A reviewing court therefore must conduct a de novo review of the arbitrators' decision on coverage issues because such issues are subject to compulsory arbitration. *Quigley-Dodd* v. *General Accident Ins. Co. of America*, 256 Conn. 225, 234, 772 A.2d 577 (2001)." *Travelers Ins. Co.* v. *Pondi-Salik*, 262 Conn. 746, 751–52, 817 A.2d 663 (2003). Thus, contrary to the claim of the plaintiff, who contends that we should defer to the determination of the arbitrator, our review is de novo because the coverage issue that gives rise to this appeal was subject to compulsory arbitration.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z[6] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ."[7] (Citation omitted; internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 7, 882 A.2d 597 (2005).

Thus, in accordance with § 1-2z, we begin our analysis with the text of General Statutes § 38a-336 (a) (2), which

[6] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[7] "The legislature enacted [§ 1-2z] in response to our decision in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003), and we have recognized that this [statutory provision] has legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of [extratextual] sources of the meaning of legislative language . . . ." (Internal quotation marks omitted.) *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 742 n.4, 865 A.2d 428 (2005).

provides in relevant part: "[E]ach automobile liability insurance policy issued or renewed on and after January 1, 1994, shall provide uninsured and underinsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless any named insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. . . . No such written request for a lesser amount shall be effective unless any named insured has signed an informed consent form which . . . shall contain a heading in twelve-point type and shall state: 'WHEN YOU SIGN THIS FORM, YOU ARE CHOOSING A REDUCED PREMIUM, BUT YOU ARE ALSO CHOOSING NOT TO PURCHASE CERTAIN VALUABLE COVERAGE WHICH PROTECTS YOU AND YOUR FAMILY. IF YOU ARE UNCERTAIN ABOUT HOW THIS DECISION WILL AFFECT YOU, YOU SHOULD GET ADVICE FROM YOUR INSURANCE AGENT OR ANOTHER QUALIFIED ADVISER.' "

In light of the dictates of § 1-2z, we first must determine whether, as the trial court concluded, the twelve-point type requirement of § 38a-336 (a) (2) is plain and unambiguous. We agree with the defendant that it is not.

It is true, of course, that the text of § 38a-336 (a) (2) provides that a reduction in uninsured and underinsured motorist coverage shall be made in writing by the named insured and, further, that the named insured shall sign an informed consent form that includes a heading, containing certain specified cautionary language, in twelve-point type. It also is true that, on its face, § 38a-336 (a) (2) contains no exceptions to the heading requirement, including the requirement that the heading be in twelve-point type.

As the defendant notes, however, the heading's statutorily mandated language warns an insured who may

elect to purchase a reduced amount of uninsured and underinsured motorist coverage that, "you are also choosing not to purchase certain valuable coverage which protects you *and your family.*" (Emphasis added; internal quotation marks omitted.) General Statutes § 38a-336 (a) (2). The required heading further provides that, "[i]f you are uncertain about how this decision will affect you, *you should get advice from your insurance agent or another qualified adviser.*" (Emphasis added; internal quotation marks omitted.) General Statutes § 38a-336 (a) (2). Because commercial fleet policies generally are purchased by commercial entities, like Friedkin, that do not have families; see, e.g., *Ceci* v. *National Indemnity Co.*, 225 Conn. 165, 174–75, 622 A.2d 545 (1993); and because such corporate entities ordinarily have departments that specialize in legal and insurance matters; *Frantz* v. *United States Fleet Leasing, Inc.*, 245 Conn. 727, 739, 714 A.2d 1222 (1998); the wording of the heading strongly suggests that its cautionary language was designed to protect individual consumers of insurance and not corporations insured under commercial fleet policies. In view of that language, we cannot determine from the text of the statute itself whether the legislature intended the heading and typeface requirements to be strictly applied to commercial fleet policyholders in addition to noncorporate, individual policyholders. Cf. *Hansen* v. *Ohio Casualty Ins. Co.*, 239 Conn. 537, 543–47, 687 A.2d 1262 (1996) (noting ambiguity inherent in "family member" clause of uninsured motorist endorsement appended to corporate automobile insurance policy); *Ceci* v. *National Indemnity Co.*, supra, 174–76 (same). Under § 1-2z, we are precluded from considering extratextual evidence of the meaning of a statute *only* when the meaning of the text of that statute is plain and unambiguous, that is, "the meaning that is so strongly indicated or suggested by the [statutory] language as applied to

the facts of the case . . . that, when the language is read as so applied, it appears to be *the* meaning and appears to preclude any other likely meaning." (Emphasis in original.) *State* v. *Courchesne*, 262 Conn. 537, 573 n.30, 816 A.2d 562 (2003). Because the language of the heading gives rise to an ambiguity as to whether the typeface requirement must be strictly enforced in the context of a commercial fleet policy, we are free to turn to extratextual evidence of the meaning of the statute as applied to such policies.

Before considering that relevant extratextual evidence, we briefly review the legislative genealogy of § 38a-336 (a) (2). Prior to 1967, when the legislature enacted General Statutes § 38-175c, which is now codified at § 38a-336, uninsured motorist coverage, although available, was not required, and coverage was limited to the amount requested by the insured. E.g., *Piersa* v. *Phoenix Ins. Co.*, 273 Conn. 519, 537, 871 A.2d 992 (2005). In 1967, the legislature required insurers to provide uninsured motorist coverage with minimum limits of coverage specified by statute. Public Acts 1967, No. 510, § 4, codified at General Statutes (Cum. Sup. 1967) § 38-175c. In 1969, the legislature amended § 38-175c to allow, inter alia, an insured to obtain, upon request, uninsured motorist coverage beyond the minimum limits required by law. See Public Acts 1969, No. 202. In 1983, the legislature amended § 38-175c again, this time to require parity of uninsured motorist coverage with the amount of liability coverage purchased by the insured unless the insured submitted a written request for a lesser amount of uninsured motorist coverage. Public Acts 1983, No. 83-461 (P.A. 83-461). In 1991, § 38-175c was transferred to § 38a-336, and, in 1993, the legislature amended § 38a-336 (a) (2) by adding the requirement of the informed consent form, including

the cautionary heading in twelve-point type. Public Acts 1993, No. 93-297, § 1 (P.A. 93-297).[8]

The legislative history pertinent to our inquiry dates back to 1983, when, as we have indicated, the legislature required that all automobile insurance policies include uninsured motorist coverage in an amount equal to the liability limits of the insured's policy, unless the insured elected, in writing, to purchase a reduced amount of uninsured motorist coverage. P.A. 83-461. During the limited legislative debate surrounding the 1983 amendment, Senator Wayne A. Baker explained that the purpose of that amendment was to ensure that "each insured who purchases more than the legally required amount of liability insurance [will] receive the same amount of uninsured motorist coverage. The insured would have an opportunity to waive in writing the additional uninsured motorist coverage. This change would increase the consumer's awareness of the value of low-cost uninsured motorist coverage which protects the insured and his family members." 26 S. Proc., Pt. 9, 1983 Sess., p. 3055. Representative Gerald M. Noonan likewise explained that, under the proposed legislation, "an individual who purchases a liability policy . . . [will] be given coverage in the same amount of the policy rather than automatically receive the minimum coverage." 26 H.R. Proc., Pt. 21, 1983 Sess., p. 7437.

We considered the legislative history and purpose of P.A. 83-461 in *Nationwide Mutual Ins. Co.* v. *Pasion*, 219 Conn. 764, 594 A.2d 468 (1991).[9] In *Pasion*, we

---

[8] Public Act 93-297 made comprehensive changes to the law of automobile insurance, including the elimination of intrapolicy and interpolicy stacking, and no-fault insurance coverage. See P.A. 93-297, §§ 1, 10 through 15, and 28. In addition, P.A. 93-297 amended the statutory scheme to allow an insured to purchase uninsured and underinsured motorist coverage with limits up to two times that of a policy's bodily injury coverage. P.A. 93-297, § 1.

[9] In *Pasion*, we construed a statutory precursor to § 38a-336 (a) (2), namely, General Statutes (Rev. to 1989) § 38-175c (a) (2), which provided in relevant part: "[E]very [automobile liability insurance] policy issued or renewed on and after July 1, 1984, shall provide uninsured motorist coverage

concluded that both insured spouses were required to sign the written request for a lesser amount of uninsured motorist coverage in order for that request to be valid because "[t]he apparent intent of the legislature in adopting sub[division] (2), as evidenced by the legislative history . . . was to assure that consumers purchasing automobile liability insurance would be made aware of the low cost of equal amounts of uninsured coverage by requiring any reduction in that coverage to be in writing. . . . To permit the signature of one named insured to bind other, possibly uninformed, named insureds would circumvent the legislature's intent that the decision to reduce uninsured motorist coverage by consumers be an informed one." Id., 770–71; see also *Colonial Penn Ins. Co.* v. *Bryant*, 245 Conn. 710, 725, 714 A.2d 1209 (1998) ("the legislative objective underlying the signature requirement of [the statute is] to promote informed decision-making by purchasers of uninsured motorist coverage").

Several years later, however, in *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 738, we declined to extend our holding in *Pasion* to commercial fleet automobile insurance policies.[10] In *Frantz*, United States Fleet Leasing, Inc. (Fleet Leasing) had leased certain vehicles to General Dynamics Corporation

---

with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless the insured requests in writing a lesser amount . . . . Such written request shall apply to all subsequent renewals of coverage and to all policies or endorsements which extend, change, supersede or replace an existing policy issued to the named insured, unless changed in writing by the insured."

[10] We note that, in 1993, the legislature amended General Statutes (Rev. to 1993) § 38a-336 (a) (2) to provide, inter alia, that a written request for a reduction in uninsured and underinsured motorist coverage is effective as long as the request is signed by "any named insured." Public Acts 1993, No. 93-297, § 1. In *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 727, however, we construed the 1991 revision of § 38a-336 (a) (2), which, like the 1989 revision of § 38-175c (a) (2); see footnote 9 of this opinion; referred only to "the insured."

(General Dynamics). Id., 730. The lease agreement between Fleet Leasing and General Dynamics required General Dynamics to maintain liability and collision coverage on the leased vehicles, and it did so under a commercial fleet policy issued to General Dynamics by the Insurance Company of North America (insurer). Id. General Dynamics also agreed to designate Fleet Leasing as an additional named insured on the insurance policy. Id. General Dynamics elected and paid for reduced uninsured and underinsured motorist coverage under the policy.[11] Id., 731. Three employees of General Dynamics were traveling in a vehicle that was owned by Fleet Leasing and leased to General Dynamics when they were injured by a tortfeasor who was operating an underinsured vehicle. Id., 730. After exhausting the liability limits of the tortfeasor's policy, the three injured General Dynamics employees commenced actions against Fleet Leasing and the insurer seeking underinsured motorist benefits under the policy that the insurer had issued to General Dynamics. Id., 732–33. Relying on our holding in *Pasion*, the employees claimed that General Dynamics' request for a reduction in uninsured and underinsured motorist coverage was invalid because the informed consent form that General Dynamics submitted had not been signed by Fleet Leasing, a named insured. Id., 733–34.

Drawing on the legislative history upon which we had relied in *Pasion*, we concluded that "the legislature did not intend to require the written consent of *all* named insureds on a commercial fleet policy as a necessary prerequisite to a reduction in coverage." (Emphasis

---

[11] Although the lease agreement between Fleet Leasing and General Dynamics was silent with respect to uninsured and underinsured motorist coverage, Fleet Leasing relied on General Dynamics to arrange for such coverage in those jurisdictions, including Connecticut, where it was required. Fleet Leasing also relied on General Dynamics to determine the level of that coverage. *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 730–31.

added.) Id., 738–39. In reaching that conclusion, we explained: "[W]e are not persuaded that requiring Fleet Leasing to provide a written request for a reduction in uninsured [and underinsured] motorist coverage under the . . . policy would further the legislative goal of ensuring that consumers are informed of the relative cost of this type of insurance. Although a corporation like Fleet Leasing may be considered a 'consumer' of insurance in the broadest sense of that word, we do not believe that a company that, like Fleet Leasing, is covered under a commercial fleet policy . . . falls within the class of consumers that the legislature sought to protect in requiring the signature of all named insureds under § 38a-336 (a) (2)."[12] Id., 739. We observed that Fleet Leasing, like other large corporations covered under commercial fleet policies, had departments specializing in legal and insurance matters, and, therefore, it was very likely that the Fleet Leasing personnel who had negotiated the insurance provisions of Fleet Leasing's lease contract with General Dynamics were fully aware of the ramifications of their decisions concerning the purchase of uninsured and underinsured motorist coverage. Id.

In *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, 79 Conn. App. 800, 807, 831 A.2d 310, cert. denied, 266 Conn. 929, 837 A.2d 802 (2003), the Appellate Court adopted our reasoning in *Frantz*. *McDonald* involved a claim that a request by Cumberland Farms, Inc. (Cumberland Farms), for a reduction in uninsured and underinsured motorist coverage was ineffective

---

[12] We also concluded that strict adherence to the requirement that all named insureds sign the request for a reduction in uninsured and underinsured motorist coverage was both unreasonable and impracticable in the context of a commercial fleet policy because "[i]dentifying all such persons and entities and securing their written consent . . . would [create] formidable administrative burdens . . . that . . . it is most unlikely our legislature intended to impose under § 38a-336 (a) (2)." *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 740.

because the informed consent form that Cumberland Farms had signed seeking the reduction did not contain the premium cost for each of the coverage options available from the insurer as required by § 38a-336 (a) (2) (C).[13] Id., 804. The Appellate Court rejected the claim, concluding that "[t]he purpose of § 38a-336 (a) (2), including the provision requiring that insurers inform consumers of the premium cost for each of the underinsured [motorist] coverage options available, is to facilitate consumers' decision-making process and to ensure that they give informed consent to reduced coverage. We do not believe that a company such as Cumberland Farms . . . which insures a fleet of vehicles to carry on a large commercial enterprise, falls within the class of consumers that the legislature sought to protect when it mandated the disclosure of premium costs under § 38a-336 (a) (2). Consequently, the fact that the informed consent form . . . did not contain a statement of premium costs does not defeat the election by Cumberland Farms . . . to reduce its underinsured [motorist] coverage limits . . . ." Id., 807.

We reach the same result in the present case. For the reasons enumerated in *Frantz* and *McDonald*, there is no reason to require strict adherence to the twelve-point type requirement of § 38a-336 (a) (2) in the context of a commercial fleet policy.[14] Friedkin, which had more than 2700 employees and was insured under a commercial fleet policy covering more than 1000 vehicles, is not a member of the class of consumers that the legislature sought to protect when it enacted that typeface requirement. Indeed, in the arbitration pro-

[13] The claim was made by an employee of Cumberland Farms who, while operating a vehicle owned by Cumberland Farms, had been injured in an accident that was caused by an underinsured tortfeasor. *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, supra, 79 Conn. App. 801–802.

[14] We note that there is nothing in the legislative history of P.A. 93-297 that bears upon the twelve-point heading requirement.

ceeding, Isbell, Friedkin's vice president of risk, who signed the informed consent form on behalf of Friedkin, attested to the fact that when she endorsed the form, she was "fully cognizant of the availability, relative costs and benefits of uninsured and underinsured motorist coverage as well as the implications of selecting minimum coverage limits," and that her endorsement reflected "a conscious decision," on behalf of Friedkin, "to select uninsured/underinsured motorist limits of $40,000 in Connecticut." Under the circumstances, we are unwilling to conclude that Friedkin's request for a reduction in uninsured and underinsured motorist coverage was ineffective even though, contrary to the dictates of § 38a-336 (a) (2), the heading of the informed consent form in which the request appeared was printed in eight-point type rather than twelve-point type.

The judgment is reversed and the case is remanded with direction to render judgment granting the defendant's motion to vacate the arbitration decision.

In this opinion the other justices concurred.

BORDEN, J., concurring. I agree with and join the majority opinion of the court. More specifically, I agree with the court that, based on the extratextual evidence of the meaning of General Statutes § 38a-336 (a) (2), "there is no reason to require strict adherence to the twelve-point type requirement of [the statute] in the context of a commercial fleet policy . . . even though, contrary to the dictates of [the statute], the heading of the informed consent form in which the request appeared was printed in eight-point type rather than twelve-point type."

I write separately, however, to point out the serious constitutional question, under the separation of powers doctrine, that General Statutes § 1-2z raises, a question

implicated by the present case.[1] Sooner or later, this court will be required to face and to resolve that question.

Under § 1-2z, a court is barred from considering any extratextual source of the meaning of a statute if the court determines that, after examining its text and its relationship to other statutes, "the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results . . . ." It is important to note that, in the present case, the only language in the text of § 38a-336 (a) (2) that frees the majority to examine the rich sources of the statute's meaning—namely, its legislative genealogy, its legislative history, its purpose, and indeed our prior case law interpreting it—and thereby permits the majority to reach a correct interpretation of it, are the references to the insured's " 'family' " and the caution to the insured to consult with " 'your insurance agent or another qualified advisor.' " It is solely those references that render the meaning of the statutory language sufficiently ambiguous to permit the court to consult the extratextual sources and to reach the correct result in this case. This is a slender reed of ambiguity.

First, there is a very plausible argument that, despite the references relied upon by the majority for ambigu-

---

[1] In his concurring opinion, Justice Zarella criticizes me for issuing this concurrence, suggesting that it is "unwarranted" for a justice of this court to employ a concurring opinion to note that there may be a serious constitutional question, on the basis of the separation of powers doctrine, regarding § 1-2z. I reject that notion. In my view, noting that a statute may raise a serious question under the separation of powers provision in the context of a concurring opinion is no less warranted than doing so in a bar journal article; see, e.g., P. T. Zarella & T. A. Bishop, "Judicial Independence at a Crossroads," 77 Conn. B.J. 21 (2003) (questioning constitutionality, on basis of separation of powers, of several Connecticut statutes); or doing so by way of a scholarly lecture. See, e.g., E. A. Peters, "Getting Away from the Federal Paradigm: Separation of Powers in State Courts," 81 Minn. L. Rev. 1543 (1997) (same).

ity, the relevant language is plain and unambiguous, and does not yield a bizarre or unworkable result.[2] Second, and more important, the question of the case would be precisely the same, but the answer undoubtedly different, if that slender reed were not present.

Consider, for example, if the mandatory language in § 38a-336 (a) (2), instead of including the cautionary references to " 'your family' " and to " 'your insurance agent or another qualified adviser,' " provided the fol-

[2] Without belaboring the point, that argument would contend the following: the term "family" appears only in the language of § 38a-336 (a) (2) that must be included in the mandatory notification portion of an informed consent form, and does not appear elsewhere in the body of the statute, which details the various notice requirements. It simply is not reasonable to presume that the legislature's use of the term "family" was intended to trump the clear and straightforward directive of § 38a-336 (a) (2) that the informed consent form "shall contain a heading in twelve-point type" with the mandatory language. In other words, the statutorily mandated language of the heading itself does not affect the threshold requirement that the heading must appear, in twelve-point type, on *all* informed consent forms. Indeed, § 38a-336 (a) (2) contains no suggestion that it applies only to personal automobile insurance policies, or that it does not apply to corporate or commercial fleet automobile insurance policies. It is far more likely that the legislature chose to mandate the use of the term "family" merely because of the large number of individuals with families who purchase insurance, and not because the legislature intended that one or more of the requirements of § 38a-336 (a) (2) should be read out of that provision when a corporation or other sophisticated insured is involved. Finally, this interpretation does not yield a bizarre or unworkable result. Section 38a-336 (a) (2) is essentially a strict liability statute, and the legislature undoubtedly was aware that, in certain cases, inequities might result from its operation. The fact that a commercial insured, like the employer here, may take advantage of it is neither bizarre nor unworkable. All an insurer has to do to comply with the statute is to use the mandated twelve-point type for all potential insureds.

In addition, the majority reasons that "the wording of the heading strongly suggests that its cautionary language *was designed* to protect individual consumers of insurance and not corporations insured under commercial fleet policies." (Emphasis added.) It could be argued that § 1-2z bars such reasoning because it involves a determination of the statute's *purpose,* which is not stated in its text and is, therefore, extratextual evidence of its meaning. I agree with the majority's mode of analysis, however, because in this instance the purpose of the statute may be inferred from its text and, therefore, is not barred from our consideration by § 1-2z.

lowing: "WHEN YOU SIGN THIS FORM, YOU ARE CHOOSING A REDUCED PREMIUM, BUT YOU ARE ALSO CHOOSING NOT TO PURCHASE CERTAIN VALUABLE COVERAGE WHICH PROTECTS YOU." In that event, the language of the statute would undoubtedly be plain and unambiguous, and the court would be deprived, by virtue of § 1-2z, of the opportunity of interpreting it, correctly, on the basis of the extratextual evidence of its meaning.[3] The result of that analysis would be that the use of the eight-point, rather than twelve-point, type would have invalidated the employer's choice of reduced coverage. Thus, that result would be mandated by § 1-2z, but would not be true to the legislature's intent in enacting § 38a-336 (a) (2), as the majority persuasively demonstrates. This example, however, illustrates the potential constitutional infirmity of § 1-2z.

A statute will not violate the separation of powers "simply because it affects the judicial function." (Internal quotation marks omitted.) *State* v. *McCahill*, 261 Conn. 492, 505, 811 A.2d 667 (2002). A statute will violate the separation of powers, however, "if: (1) it governs subject matter that not only falls within the judicial

---

[3] The fact that we have already construed § 38a-336 (a) (2) using its legislative history and purpose does not, however, remove the constraints imposed by § 1-2z, as the majority implicitly acknowledges. None of that purpose or history is contained in the text of § 38a-336 (a) (2) and, therefore, we presumably are barred by § 1-2z from considering it in the absence of ambiguity. Indeed, this same analytical method has previously been employed by a majority of this court. See *Genesky* v. *East Lyme*, 275 Conn. 246, 279 n.5, 881 A.2d 114 (2005) (*Borden, J.*, concurring) (noting that majority, in determining whether heart and hypertension statute is ambiguous, assumed that § 1-2z prohibits consideration of maxim that workers' compensation legislation is remedial and to be construed broadly). Furthermore, for purposes of considering the question of the constitutionality of § 1-2z, the point is the same: even if we had not previously interpreted the statute, we nonetheless would be barred by § 1-2z from considering any extratextual sources of its meaning, including its purpose and its legislative history.

power, but also lies exclusively within judicial control; or (2) it significantly interferes with the orderly functioning of the [court's] judicial role." (Internal quotation marks omitted.) Id., 505–506. In my view, there is a serious question whether § 1-2z violates either or both of these precepts.

It can be seriously argued that § 1-2z, because of its breadth, potentially applying to almost every case of statutory interpretation that we encounter, governs a subject matter lying exclusively within the judicial power, the task of interpreting statutes. Under the doctrine of the separation of powers, there is authority that the interpretation of statutes falls exclusively within the judicial sphere. "Statutory interpretation is a quintessentially judicial function . . . ." *D'Eramo* v. *Smith*, 273 Conn. 610, 619, 872 A.2d 408 (2005). "[T]he broad division between the power of the courts and the power of the legislature can be drawn as follows: It is the province of the legislative department to define rights and prescribe remedies: *of the judicial to construe legislative enactments*, determine the rights secured thereby, and apply the remedies prescribed." (Emphasis added; internal quotation marks omitted.) *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 343, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985), quoting *Atwood* v. *Buckingham*, 78 Conn. 423, 428, 62 A. 616 (1905). "[T]he legislature makes, the executive executes, *and the judiciary construes the law.*" (Emphasis added; internal quotation marks omitted.) *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 576, 594, 37 A. 1080 (1897), quoting *Wayman* v. *Southard*, 23 U.S. 1, 46, 6 L. Ed. 253 (1825). This principle finds its root in one of the most basic tenets of American law. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803).

It also can be seriously argued that § 1-2z significantly interferes with the orderly function of our judicial role, because it may, in a given case, prohibit us from performing our judicial task of statutory interpretation in a way that accurately determines the meaning of a statute, and because it requires us to spend significant amounts of time and energy engaging in lengthy debates over whether statutory language is ambiguous, even where we ultimately agree on the outcome of the case. Sec, e.g., *Genesky* v. *East Lyme*, 275 Conn. 246, 881 A.2d 114 (2005) (compare majority opinion with concurring opinion); *State* v. *Miranda*, 274 Conn. 727, 878 A.2d 1118 (2005) (compare per curiam opinion with concurring opinion of Justice Borden).

Under either scenario, it seems to me that § 1-2z directs us, as judges, on how to *think* about the process of statutory interpretation and, in that respect, may overstep the boundary between the legislative and judicial functions. Of course, I have not attempted in this concurrence to spell out any other arguments either supporting or challenging the constitutionality of § 1-2z. Finally, I have not reached any conclusion about that question. I have simply tried to indicate that, in my view, there is a serious question about the constitutionality of § 1-2z that this court should consider at some appropriate time.

ZARELLA, J., concurring. Although I agree with and join in the reasoning of the majority in all respects, I write separately to disassociate myself from the unwarranted speculation in the concurrence of Justice Borden that a coordinate branch of government may have acted unconstitutionally in enacting General Statutes § 1-2z. I am concerned that Justice Borden's concurring opinion represents a significant and unfortunate departure from our jurisprudence of restraint and deference. In the present case, it is clear from the record that neither

party has claimed that § 1-2z is unconstitutional, and, indeed, the appellant expressly declined to raise such a claim. Additionally, as the majority opinion makes clear, the statute's constitutionality need not be addressed in order to resolve the issues presented. Nevertheless, Justice Borden, in his concurring opinion, articulates at length his doubts regarding the constitutionality of § 1-2z under the separation of powers doctrine.

A judicial opinion has been defined as "a reasoned elaboration, publicly stated, that justifies a conclusion or decision. Its purpose is to set forth an explanation for a decision that adjudicates a live case or a controversy that has been presented before a court." R. Aldisert, Opinion Writing (1990) p. 9. A concurring opinion serves the special purpose of presenting an additional rationale or different theory in support of the majority's conclusion. Id., p. 166. Certainly, a concurrence can serve to warn of the precedential effect of a majority opinion or to warn that the legal doctrine employed therein must not be "pressed too far" or extended in other factual contexts. R. Moorhead, "Concurring and Dissenting Opinions," 38 A.B.A. J. 821, 823 (1952). Justice Borden's concurrence meets none of these criteria because it extends beyond the reasoning of the majority and speaks to an issue that is not before the court. I never have understood the purpose of a concurrence to be an excursion into waters uncharted by the parties' briefs or to be a comment on issues that are not presented in the case.[1]

Moreover, our precedent is absolutely clear on the limits of our authority to address constitutional issues. As we recently have stated, "[w]e do not take lightly

[1] Footnote 1 of Justice Borden's concurrence serves to highlight one of my main points, that is, I do not believe that a concurring opinion serves the same purpose as a speech or scholarly article.

our responsibility to act as the final arbiter in resolving issues relating to our constitution. See *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803); *Pratt* v. *Allen*, 13 Conn. 119, 132 (1839). *We also, however, do not engage in addressing constitutional questions unless their resolution is unavoidable.* Ordinarily, [c]onstitutional issues are not considered unless *absolutely necessary* to the decision of a case . . . . *State* v. *Cofield*, 220 Conn. 38, 49–50, 595 A.2d 1349 (1991); *State* v. *Onofrio*, 179 Conn. 23, 37–38, 425 A.2d 560 (1979); *State* v. *DellaCamera*, 166 Conn. 557, 560–61, 353 A.2d 750 (1974); see *Ashwander* v. *Tennessee Valley Authority*, 297 U.S. 288, 346–47, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring). . . . *State* v. *Torres*, 230 Conn. 372, 382, 645 A.2d 529 (1994); *Moore* v. *McNamara*, 201 Conn. 16, 20, 513 A.2d 660 (1986) ([t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case); see also 16 Am. Jur. 2d, Constitutional Law § 117 (1998)." (Emphasis added; internal quotation marks omitted.) *State* v. *McCahill*, 261 Conn. 492, 501–502, 811 A.2d 667 (2002).

A similar point of view has been expressed in other jurisdictions. "While [c]ourts cannot shun the discussion of constitutional questions when fairly presented, they will not go out of their way to find such topics. They will not seek to draw in such weighty matters collaterally, nor on trivial occasions. It is both more proper and more respectful to a co-ordinate department, to discuss constitutional questions only whe[n] that is the very lis mota. Thus presented and determined, the decision carries a weight with it to which no extra-judicial disquisition is entitled." *Hoover* v. *Wood*, 9 Ind. 271, 273 (1857). At least one prominent constitutional scholar likewise has concluded that "[i]t must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of

the fallibility of the human judgment, will shrink from exercising in any case [in which] he can conscientiously and with due regard to duty and official oath decline the responsibility. The legislative and judicial are co-ordinate departments of the government, of equal dignity; each is alike supreme in the exercise of its proper functions, and cannot directly or indirectly, while acting within the limits of its authority, be subjected to the control or supervision of the other, without an unwarrantable assumption by that other of power which, by the constitution, is not conferred upon it." T. Cooley, Constitutional Limitations (7th Ed. 1903) p. 229. In keeping with this policy, we repeatedly have declined to consider constitutional issues when alternative, non-constitutional grounds exist for deciding an appeal. See *Binette* v. *Sabo*, 244 Conn. 23, 84, 710 A.2d 688 (1998) (*Katz, J.*, concurring in part and dissenting in part).

Our restraint in such matters does not stem from blind adherence to principles of judicial deference to the legislative and executive branches of government but, rather, from our recognition that members of *all three* branches, in carrying out their duties, have a common obligation and solemn responsibility to support the United States constitution and the constitution of the state of Connecticut. See General Statutes § 1-25.[2] Thus, the legislature, in passing legislation, and the governor, in signing legislation into law, are stating, in effect, that they believe the legislation is constitutional. Indeed, one commentator has noted that, at the time

---

[2] General Statutes § 1-25 provides in relevant part: "The forms of oaths shall be as follows, to wit:

"FOR MEMBERS OF THE GENERAL ASSEMBLY, EXECUTIVE AND JUDICIAL OFFICERS.

"You do solemnly swear (or affirm, as the case may be) that you will support the Constitution of the United States, and the Constitution of the state of Connecticut, so long as you continue a citizen thereof; and that you will faithfully discharge, according to law, the duties of the office of [      ] to the best of your abilities; so help you God. . . ."

of our country's founding, the federal constitution "integrated several enforcement devices in its general system of separated powers." A. Amar, America's Constitution (2005) p. 60. One such device, the oath of office, obligated members of both houses of Congress, as well as the president, to avoid the enactment of proposed bills that might offend the constitution. Id. "Among men punctilious about their personal reputations, such oaths would discourage—by making *dishonorable*—any legislative logrolls involving proposals that either house deemed unconstitutional. . . . So, too, if the president were asked to put his own name on every proposed bill, his sense of personal honor would prevent him from signing on to a project that he found to violate his personal pledge to preserve, protect, and defend the [c]onstitution." (Emphasis in original; internal quotation marks omitted.) Id., pp. 62–63. It is this shared commitment by members of all three branches of government to uphold the constitution, expressed in the oaths they take upon assuming office, that underlies the "bedrock principle" that Connecticut courts "indulge in every presumption in favor of [a] statute's constitutionality." (Internal quotation marks omitted.) *State* v. *Lutters*, 270 Conn. 198, 217, 853 A.2d 434 (2004).

To be sure, this court, on occasion, has taken note of, but declined to consider, constitutional issues not directly implicated in the resolution of an appeal or addressed by the parties in their briefs. See, e.g., *State* v. *DeFusco*, 224 Conn. 627, 629 n.5, 620 A.2d 746 (1993) (declining to consider whether garbage left for collection outside but adjacent to curtilage of residence enjoys protection under state constitution because issue did not fall within scope of certified question); *State* v. *Breton*, 212 Conn. 258, 271, 562 A.2d 1060 (1989) (declining to consider whether death penalty violated state constitution because defendant did not advance

concrete arguments for separate state constitutional treatment of issue). Such issues, however, typically have been raised not by the justices themselves but by the parties or the lower courts.

In the present case, Justice Borden suggests that § 1-2z raises a "serious constitutional question" that this court "[s]ooner or later . . . will be required to face and to resolve . . . ." In light of the foregoing policy of avoidance of constitutional issues unless absolutely necessary to the decision of a case, even when those issues are raised by the parties, it is troubling to me that a member of this court would suggest that a constitutional issue exists when neither of the parties has done so. Even more inexplicable is Justice Borden's devotion of a significant portion of his concurring opinion to explaining why § 1-2z may violate the separation of powers doctrine. I simply do not comprehend this apparent thirst for debate on a matter that is not in dispute.

Accordingly, while I concur in the reasoning of the majority, I lament Justice Borden's unwarranted suggestion that a coordinate branch of government has acted in violation of its constitutional duties.